IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
December 6, 2016 Session

**RICHARD LLOYD ODOM v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Shelby County**
**No. 91-07049        Don R. Ash, Senior Judge**

_____

**No. W2015-01742-CCA-R3-PD**

_____

The Petitioner, Richard Lloyd Odom, appeals the Shelby County Criminal Court's denial of his petition for post-conviction relief from his conviction of first degree felony murder and resulting sentence of death. On appeal, the Petitioner contends that he received the ineffective assistance of counsel, raises various issues related to his post-conviction evidentiary hearing, and challenges the imposition of the death penalty. Having discerned no error, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which ALAN E. GLENN and ROBERT L. HOLLOWAY, JR., JJ., joined.

Jonathan King and Kertyssa Smalls, Assistant Post-Conviction Defenders, for the appellant, Richard Lloyd Odom.

Herbert H. Slatery III, Attorney General and Reporter; Zachary T. Hinkle, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Stephen Jones, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**I.  Factual Background**

In 1991, the Petitioner raped and stabbed to death the elderly victim in a Memphis parking garage. A Shelby County Criminal Court Jury convicted him of first degree felony murder committed during the perpetration of rape and sentenced him to death based upon the finding of three aggravating circumstances:  (1) the Petitioner had been convicted of one or more prior violent felonies; (2) the murder was especially heinous, atrocious, or cruel; and (3) the murder was committed during the Petitioner's escape from

lawful custody. Tenn. Code Ann. § 39-13-204(i)(2), (5), (8).

Our supreme court affirmed the Petitioner's conviction on direct appeal but reversed his death sentence. *State v. Odom*, 928 S.W.2d 18 (Tenn. 1996). The court concluded that the trial court erred by excluding mitigating evidence and in instructing the jury during sentencing. *Id.* at 21. The court also concluded that the evidence did not support the heinous, atrocious, or cruel and the escape aggravating circumstances. *Id.* The case was remanded for a new sentencing hearing. *Id.*

After the second sentencing hearing, a jury again sentenced the Petitioner to death. The jury found the existence of one aggravating circumstance: the Petitioner had been convicted of one or more prior violent felonies. Tenn. Code Ann. § 39-13-204(i)(2). On appeal of the death sentence, our supreme court again ordered a new sentencing hearing. *See State v. Odom*, 137 S.W.3d 572 (Tenn. 2004). The court concluded that the trial court erroneously admitted detailed and graphic evidence of the Petitioner's prior violent felonies. *Id.* at 575.

At the conclusion of the third sentencing hearing, a jury again sentenced the Petitioner to death. The jury found the existence of two aggravating circumstances: (1) the Petitioner had been convicted of one or more prior violent felonies, and (2) the murder was committed during the commission of a robbery. Tenn. Code Ann. § 39-13-204(i)(2), (7). Our supreme court affirmed the death sentence on appeal. *See State v. Odom*, 336 S.W.3d 541 (Tenn. 2011).

Thereafter, the Petitioner timely filed a petition seeking post-conviction relief. The Office of the Post-Conviction Defender was appointed to represent the Petitioner and amended the petition. Following an evidentiary hearing, the post-conviction court issued a lengthy written order denying relief. This appeal ensued.

A. Trial Evidence

The following is a summary of the evidence of the crime from the 1992 guilt phase of the trial:

The record indicates that at approximately 1:15 p.m. on May 10, 1991, Ms. Mina Ethel Johnson left the residence of her sister, Ms. Mary Louise Long, to keep a 2:30 p.m. appointment with her podiatrist, Stanley Zellner, D.P.M. She agreed to purchase a few groceries while she was out. Johnson had not returned at 5 p.m.; this delay prompted Long to call Zellner. He told Long that Johnson had not kept her appointment. As a result of a subsequent call from Long, Zellner agreed to return to his office and look for Johnson's car in the parking garage. He located her car in the

parking garage and observed her body inside.  He went immediately to the Union Avenue police precinct and notified officers.

Investigating officers found Johnson's body on the rear floorboard of her car with her face down in the back seat.  Her dress was up over her back, and an undergarment was around her ankles.  One of several latent fingerprints lifted from the "left rear seat belt fastener" of Johnson's car matched a fingerprint belonging to the defendant, Richard Odom, alias Otis Smith.

The medical examiner testified that Johnson had suffered multiple stab wounds to the body, including penetrating wounds to the heart, lung, and liver.  These wounds caused internal bleeding and, ultimately, death.  The medical examiner noted "defensive" wounds on her hands.  Further examination revealed a tear in the vaginal wall and the presence of semen inside the vagina.  In the medical examiner's opinion, death was neither instantaneous nor immediate to the wounds but had occurred "rather quickly."

Three days after the incident, Sergeant Ronnie McWilliams of the Homicide Unit, Memphis Police Department, arrested the defendant.  As a result of a search incident to arrest, McWilliams confiscated a large, open, lock-blade knife from the defendant.  When they arrived at the homicide office, McWilliams told the defendant of the charges against him and read his *Miranda* rights to him.  The defendant executed a "Waiver of Rights" form, signing "Otis Smith."  A short time later he acknowledged having identified himself falsely, executed a second rights waiver by signing "Richard Odom" and gave McWilliams a complete, written statement.

In his statement, the defendant said that his initial intention was to accost Johnson and "snatch" her purse after having seen her in the parking garage beside her car.  He ran to her and grabbed her; both of them fell into the front seat.  He then pushed her over the console into the rear seat.  He "cut" Johnson with his knife.  Johnson addressed him as "son."  This appellation apparently enraged the defendant; he responded that "[he] would give her a son."  He penetrated her vaginally; he felt that Johnson was then still alive because she spoke to him.  Beyond the first wound, the defendant claimed not to have remembered inflicting the other stab wounds.  Thereafter, the defendant climbed into the front seat and rifled through Johnson's purse.  He found nothing of value to him, except the car keys, which he later discarded.  He then went to an abandoned building where he had clothing and changed clothes.

The defendant presented no evidence at this phase of the trial. Based on the evidence above, the jury convicted the defendant of first-degree murder committed in the perpetration of rape.

*Odom*, 928 S.W.2d at 21-22.

The following is a summary of the evidence from the 2007 resentencing hearing:

At the third sentencing hearing, the State offered proof that at approximately 1:15 p.m. on the date of her murder, the victim, a seventy-eight-year-old woman, left the residence of her sister, Mary Louise Long, for an appointment with Dr. Stanley Zellner, a podiatrist. When the victim had not returned by 4:30 p.m., Ms. Long called Dr. Zellner, who informed her that the victim had failed to attend her scheduled appointment. Ms. Long first telephoned the police department to report the victim's disappearance and then contacted John Sullivan, a long-time acquaintance, who agreed to help look for the victim. The two "traced the route" the victim had to drive and found her car in a parking garage. When Sullivan approached the vehicle, he observed the body of the victim on the floor of the backseat. After returning to the car, he did not inform Ms. Long what he had seen, explaining that "she was a very nervous, high strung person." As he drove out of the parking garage, Sullivan encountered a police car parked on a nearby street and told the officer where he could find the body. Sullivan then drove Ms. Long to her residence before returning to the crime scene to provide the police with a statement.

Donna Michelle Locastro, who was employed by the Memphis Police Department at the time of the murder, had taken Ms. Long's missing person's call prior to the discovery of the body. She and her partner, Don Crowe, first called the local hospitals, the city wrecker dispatch, and the traffic bureau before setting out on the route the victim would have driven to her appointment. The officers arrived at the parking garage at approximately 8:00 p.m., shortly after Sullivan had discovered the body. When Officer Locastro looked inside the vehicle, she noticed what appeared to be blood on the right front passenger's seat and a wallet wedged between the emergency brake and the driver's seat. She also saw that the victim was clutching what appeared to be a check in her left hand. She and other officers secured the area and contacted the homicide unit.

Detective Ronnie McWilliams, who was assigned to the case on the day after the murder, testified that a fingerprint found in the vehicle led to the identification of "Otis Smith" as a potential suspect. Three days after the murder, "Smith" was arrested. He had in his possession an "Old

Timer's Light Blade Knife," which had a fold-out blade of over four inches. During the arrest, Detective McWilliams informed "Smith" of his rights. When he signed a waiver, however, Detective McWilliams observed that "Smith" had started to sign another name. Later, when his true identity was established, "Smith" signed a second waiver under the name Richard Odom.

In a written statement to the police, the Defendant, thirty years old at the time and unemployed, admitted killing the victim and provided details of the crime. He stated that just before the murder, he was in the stairwell trying to relax. When another individual entered the stairway, he entered the garage area at the same time the victim arrived. Claiming that he intended only to steal her purse so he could "get something to eat and catch a nap," he told officers that when he ran over to grab her purse, he "somehow grabbed her arm or hand or whatever and we kind of fell back into the car." He stated that he always kept his knife open because of potential danger in the area and that "somehow or another," while "[p]ushing the lady off of me and over the back seat . . . [,] I managed to . . . cut her, I guess." The Defendant also told the police that when "[t]he lady called me, son, . . . I told her, I would give her a son [and] I went to the back . . . seat with her. I don't know if I stabbed her when I got in the back seat with her or when I got back in the front seat." The Defendant admitted that he raped the victim and insisted that she was still alive at the time, claiming that she remarked that she had never had sex before. He told police that he could not remember whether he had stabbed the victim again after the rape. The Defendant acknowledged searching the victim's purse and wallet, but claimed that he found nothing of value and left the items in the car. While admitting that he took the victim's car keys, he stated that he threw them away as he left the parking garage. At the conclusion of his interrogation, the Defendant remarked, "I need help mentally and psychologically, something I can't express just freely and openly."

Dr. Jerry Thomas Francisco, the Shelby County Medical Examiner at the time of the murder, conducted the autopsy. He found a stab wound at the front of the victim's chest and two on the right side of her body towards the back. He also observed cuts on the victim's right hand, which he described as defensive wounds. The knife wound to the front of her chest passed into the right side of the heart, causing two tears which, in turn, caused blood to accumulate in the heart cavity and the left side of her chest. A wound near the side penetrated her chest cavity and produced a tear in the lung, which caused bleeding in the lung cavity. The other wound to the side passed through her abdominal cavity into the liver, which produced bleeding in the peritoneal cavity. Dr. Francisco, who determined that the

- 5 -

victim was 5 feet 6 inches in height and weighed 113 pounds, characterized each of the three wounds as lethal. In his opinion, the victim died between one and two hours after the wounds were inflicted. During his examination of the body, Dr. Francisco also discovered a tear of the vagina, a wound he described as caused by forcible penetration. Fluid samples from the victim's vaginal area "[r]evealed the presence of sperm and enzymes that are present in seminal fluid." It was Dr. Francisco's opinion that the vaginal injuries were likely the product of forcible rape.

The proof also established that the Defendant had been convicted of murder in Rankin County, Mississippi in 1998, seven years after the victim's murder. The 1998 conviction was for a murder that had occurred some twenty years earlier. The Defendant was sentenced to a term of life. At the request of defense counsel, the judgment of conviction was admitted as an exhibit so that the jury would understand that there was "a detainer in Mississippi waiting on [the Defendant] no matter what happens in this case."

The defense counsel, in an effort to persuade the jury to spare the Defendant's life, called Glori Shettles, an investigator who was qualified as an expert in the field of mitigation, and several other witnesses to testify. Because Ms. Shettles had previously worked for the Tennessee Board of Probation and Parole, she also qualified as an expert in parole procedure and policies. She testified that her background study indicated that the Defendant, who had one older and one younger sister, was born in 1960 to Norman and Nellie Smith, who were twenty and seventeen years old respectively. Ms. Shettles described his home life as "unstable" and testified that his mother abandoned the family before the Defendant was two-and-a-half years old. The Defendant never saw his birth mother again. After the Defendant and his sisters were sometimes left at a daycare center "for days," the State intervened and the Defendant and his two sisters were adopted by members of the Odom family. The Defendant was adopted by Jimmy and Shirley Odom, who had three biological children at the time: Cindy, Jimmy Jr., and Larry, ranging in ages from two to seven. When the Defendant, at age three, joined the Odom family, he had cigarette burns on his body. Burns on his feet were so severe that he was unable to wear socks and shoes. About a year after adopting the Defendant, the Odoms divorced, and his adoptive mother married Marvin Bruce, who allegedly mistreated the Defendant and his brother Larry. According to Ms. Shettles, Bruce used "excessive discipline" on both boys and ridiculed the Defendant for wetting the bed by hanging his sheets and clothes outside for others to see. Ms. Shettles also learned that when the Defendant and Larry were bathing, Bruce [. . .] "would scrub them excessively . . . would pull and tug

- 6 -

on their penis [and] call them names and make fun of them." Her investigation indicated the Defendant had also endured cruelty at the hands of Shirley Odom's mother, who never accepted the Defendant as part of the family and treated him differently from her biological grandchildren; no one Ms. Shettles interviewed "[had] the impression that [Shirley Odom's mother] cared anything for" the Defendant.

The Defendant, when an adolescent, ran away from the Bruce home and subsequently was ordered into the Mississippi juvenile court system. A psychological evaluation performed for the authorities there when the Defendant was fourteen years old indicated that he suffered from impaired insight, memory, and reasoning. He was diagnosed as having a moderate to severe personality disturbance. The evaluator determined that the Defendant only read at "a beginning second grade level" and "strongly urge[d that he not be] place[d] . . . in any academic situation." It was recommended that he enter a "complete evaluation program" in order to avoid psychosis or mental deterioration to the point of institutionalization.

Thereafter, the Defendant was placed in a Caritas program, but was found unfit to participate after thirty days. After his release in 1975, the Defendant was returned to the juvenile authorities. He escaped to be with his birth father, who lived one hundred and thirty miles away. Afterward, he voluntarily returned and was placed at the Columbia Training Center. According to Ms. Shettles, the Defendant tried to run away from Columbia several times. Because on one occasion the Defendant was treated for "a severe contusion of the right eye and jaw," Ms. Shettles speculated that he had been beaten while institutionalized there. During this period, a psychologist, who predicted that the Defendant would be incarcerated his whole life, described him as "brain damaged, incorrigible, antisocial, unable to respond to usual social contingency program [sic] and a loser with respect to probable adult adjustments." The psychologist also believed that the Defendant was "untreatable, unmanageable and a liability to society for the rest of his natural life," commenting that "if this youngster changes for the better, it will be an act of God." When the Defendant was fifteen, he was conditionally released and, for a time, helped care for his uncle, who had lost his legs to gangrene.

Ms. Shettles then addressed the Defendant's record at Riverbend Maximum Security Prison, where he had been incarcerated since 1992. During the period since the victim's murder, he had obtained his GED and a paralegal certification. He worked as a teacher's aide, participated in life skills and Bible study classes, and also engaged in various arts and crafts. He was described by a correctional officer as a hard worker, having a

positive attitude, being helpful, and treating other inmates and staff with courtesy. The Defendant's only infraction was in 1996, when he threw a mop bucket towards a guard, who, while standing behind a glass barrier, had allegedly taunted him. Ms. Shettles remarked that one write-up during this period of time was an "extremely low number." She also commented that the Defendant's prison record was "very positive," rating "in the top three."

In her capacity as an expert on parole procedures, Ms. Shettles described the Defendant's chances for release on a life sentence as "close to impossible." She made specific reference to the Defendant's other murder conviction in Mississippi, his escape from jail just prior to the murder of the victim, and prior theft and robbery convictions. She also testified that even if the Defendant received parole in Tennessee, he would be returned to Mississippi to serve the remainder of the life sentence there.

After reviewing the exhibits pertaining to mitigation, the jury submitted a series of written questions, including whether "mandatory parole" and "parole" could be "define[d] in layman's terms." Afterward, defense counsel recalled Ms. Shettles, who testified that if the Defendant was given a life sentence in this case, he would not be eligible for mandatory parole. She also explained that if sentenced to life imprisonment, the Defendant would be eligible for discretionary parole after twenty-five years, but that his prior murder conviction and his escape from prison in Mississippi made parole highly unlikely.

Tim Terry, an inmate records manager at Riverbend, confirmed that if the Defendant ever received parole in Tennessee, he would be returned to Mississippi to serve his life sentence there. He provided assurances that, in the event the Defendant received a life sentence for the victim's murder, he would not be moved from Riverbend to a local county jail.

Dr. Joseph Angelillo, a clinical psychologist who qualified as an expert in forensic psychology, evaluated the Defendant and reviewed his social history. While admitting that he was unable to make a specific diagnosis, Dr. Angelillo found indications of "schizoid personality features," marked by a tendency to do things alone, sub-par social skills, lack of joy, withdrawal from others, and a fear of relationships "unless [there is] absolute assurance that they're going to be accepted." In his opinion, the lack of sufficient mental health treatment afforded the Defendant as a child, the rejection he had experienced, and the physical and sexual abuse he had undergone all had a profound effect on his development. Dr. Angelillo testified that the Defendant's time in the

structured environment of Riverbend had "behaviorally defined . . . his ability . . . to engage in constructive activities." He believed that the Defendant would continue to thrive in this structured environment if given a life sentence.

Dorothy Rowell, the Defendant's adoptive aunt, also testified on his behalf, describing him as a "part of our family." She stated that her mother had adopted one of the Defendant's sisters, and that the other had been adopted by Ms. Rowell's sister. Ms. Rowell, who had spent a substantial amount of time with the children prior to the Odoms' divorce, described the Defendant as "[v]ery sweet," "[v]ery loving," "[a]lways smiling," "[h]appy, and a [v]ery precious little boy." She stated, however, that after the divorce of his adoptive parents "[h]e wasn't the happy smiling little boy that I remembered." She testified that the Defendant, when a teenager, "was very, very good" with her invalid brother, Charles, and "[t]reated him like a baby."

Cindy Martin, the Defendant's adoptive sister, described the Defendant as "[t]he sweetest person you would ever want to meet" prior to the time Marvin Bruce, his stepfather, became a part of his life. She described Bruce as "horrible" and a "terrible person" who mistreated the Defendant. She stated that after Bruce's arrival, the children stayed with their grandmother more often, and while Ms. Martin enjoyed being there because her grandmother generally "spoil[ed] kids," their grandmother "never really accepted [the Defendant] as her grandchild" and "would hit him with anything she could find."

Jimmy Odom, Jr., the Defendant's older adoptive brother, testified that prior to the Odoms' divorce, the Defendant was treated well, and that they were "kind of like a family then." He also claimed that things changed after his mother remarried, and that the Defendant "wasn't treated like a child" and "never was loved." He described their grandmother as "a mean woman" who often struck the Defendant "with belts and stuff like that," and who never accepted the Defendant into the family. He called Marvin Bruce "a pervert—[j]ust a sorry person." He stated that if the Defendant ever tried to reach for food at the dinner table before someone else, his stepfather "would pop him up beside his head, . . . and just make him wait." Although he never witnessed Bruce sexually abusing the Defendant, Jimmy, Jr. stated that he had "no doubt" that he had physically abused him. He testified that there was "no love in our family" and that, as a result, the Defendant "never had a chance."

Like the Defendant, Jimmy, Jr. was housed at Columbia Training School for a time. He stated that on each day of their detention, the residents spent forty-five minutes reading and forty-five minutes on mathematics, but that the rest of the day was spent "in the fields." He testified to the excessive forms of discipline at the school, asserting that "[t]hey would whup you with a board" and that "if you couldn't take the licks they would get other people to hold you down." He also stated that when residents ran away, they would receive a beating from the staff. Jimmy, Jr., who was an inmate at Parchman Prison at the same time as the Defendant and their brother Larry, described it as "a real bad prison," where juvenile inmates are not housed separately. He stated that both Larry and the Defendant were sexually abused by the older inmates there and that his efforts to take up for his younger brothers often resulted in fights at the prison.

Several others who had become acquainted with the Defendant during his time in prison also testified on his behalf. Celeste Wray, who had been involved in prison ministries for eighteen years, corresponded with the Defendant on a regular basis and developed a friendship with the Defendant. She stated that her letters from the Defendant had "been pleasurable and enjoyable" and that they were "always very respectfu[l], which I appreciated." Ricky Harville, who was an instructor at Riverbend, testified that the Defendant worked as his aide when he began teaching at the prison in 2003. He recalled that the Defendant assisted the other inmates with reading and writing and that his interaction with them was "very positive." He stated that the Defendant was "very helpful," that he approached his job in a very positive manner, and that he served as a role model for other inmates who sought educational opportunities. In his opinion, the Defendant would continue to impact other inmates in a positive way if he received a life sentence. Gordon Janaway, a former teacher in various correctional institutes, taught the Defendant in a GED class at Riverbend. He testified that after the Defendant obtained his certificate, he became a clerk in the classroom. Janaway stated that the other inmates "really respected him because he had earned a GED . . . which is not easy to do in corrections." Jim Boyd, who taught a life skills course at Riverbend, met the Defendant while conducting a class. Boyd testified that the Defendant was "an active participant" in the class and observed that the Defendant had changed "for the better" during his time in prison. Finally, Helen Cox, who was also involved in the life skills course, testified that she kept a photo of the Defendant on her desk that was taken the day he received his GED. She described the Defendant as a part of her extended family.

*Odom*, 336 S.W.3d at 549-54 (footnotes omitted).

## B. Post-Conviction Evidence

Lead sentencing counsel testified that he was appointed on July 14, 2004, to represent the Petitioner for the 2007 resentencing hearing. Sentencing co-counsel also was appointed, and Glori Shettles with Inquisitor, Inc., was hired as the primary mitigation investigator. Counsel had the benefit of reviewing all of the files and records from the previous hearings in this case, including the mitigation investigation previously performed by Ms. Shettles during the first resentencing hearing. Counsel also had the benefit of talking with the previous attorneys. The defense team held numerous meetings to discuss the course of mitigation. Ms. Shettles regularly kept counsel updated on her investigation, and the defense team discussed the types of experts that might be used. According to lead sentencing counsel, Ms. Shettles recommended securing a forensic psychiatrist to evaluate the Petitioner.

Counsel ultimately filed a motion on October 11, 2007, to secure the services of Dr. Joseph Angelillo, a forensic psychologist. The motion was granted that same day. Lead sentencing counsel said that, although the resentencing hearing was scheduled to commence approximately two months later, he usually requested funding for experts further in advance if they were a "key part" of the case. He said Dr. Angelillo was not a key part of their strategy. According to lead sentencing counsel, the defense relied on Dr. Angelillo merely to determine if anything was missing from the information they already possessed about the Petitioner's mental health. Counsel also filed a motion for additional funding the day the resentencing hearing commenced. The motion was granted the same day.

Lead sentencing counsel acknowledged reviewing a letter from Ms. Shettles to previous counsel advising that it would be beneficial to explore whether the Petitioner suffered from organic or neurological brain damage. He also reviewed a document from prior counsel referencing two episodes where the Petitioner lost consciousness from closed head trauma and another requesting that the Petitioner undergo a PET (Positron Emission Tomography) scan. Lead sentencing counsel also knew about a 1974 psychological evaluation report by Dr. Daniel Cox indicating the Appellant had a verbal IQ of 67, a performance IQ of 100, and a full-scale IQ of 81. That report concluded that the discrepancy between the verbal and performance scores reflected moderate to severe emotional personality disturbance and that there was evidence of mild organic neurological deficiency. Dr. Cox also considered the Petitioner to be "brain damaged, incorrigible, antisocial, unable to respond to usual social contingency programming and a loser with respect to probable adult adjustments." Dr. Cox recommended in 1974 that the Petitioner undergo extensive medical, psychiatric, and psychological evaluations. Lead sentencing counsel said he was not certain he wanted Dr. Angelillo to see Dr. Cox's reports. He admitted that there was concern the Petitioner had organic or neurological

brain damage, and he stated that they discussed retaining a neurologist and neuropsychologist. Lead sentencing counsel said, though, that he would not always present evidence of a defendant's brain damage during a capital sentencing trial. He said it depended on the case.

Counsel knew life without the possibility of parole was not a sentencing option for the Petitioner. However, as part of their defense, they tried to explain to the jury that it was extremely unlikely the Petitioner would ever be considered eligible for parole if given a life sentence. Lead sentencing counsel identified a motion the defense drafted to strike the Petitioner's prior murder conviction from consideration as an aggravating circumstance because the crime was committed while the Petitioner was a juvenile. They decided not to file it, though, because they "felt that it was clear that was coming in, and that we were going to keep some of the details of that out that were going to drift in if we opened the door on it."

On cross-examination, lead sentencing counsel testified that, although their investigation team pursued aspects of the guilt phase of the trial, the presentation of a residual doubt defense during mitigation was not part of their strategy. Lead sentencing counsel acknowledged that the Petitioner was willing to submit to DNA testing and that the investigators identified a handwriting expert willing to examine the Petitioner's statement to the police. Lead sentencing counsel said he reviewed all of the information obtained by their investigators and ultimately concluded there was no evidence to reasonably support a residual doubt defense during the resentencing hearing.

Lead sentencing counsel praised the investigative work performed by Ms. Shettles. He respected her opinion and listened to her suggestions. Lead sentencing counsel thought defense counsel and the investigative team maintained open communication and had a good working relationship. Lead sentencing counsel said it was "the best mitigation [he] ever had" in a capital case. The entire defense team met numerous times and discussed and considered the different mitigation strategies available in this case. According to lead sentencing counsel, possibly the most difficult obstacle they faced was the fact that the jury would be informed the Petitioner would be eligible for parole after serving twenty-five years if given a life sentence, which in the Petitioner's case would have been eight years from the second resentencing hearing. Counsel unsuccessfully objected to that jury instruction. Counsel's strategy then was to convince the jury that the Petitioner would almost certainly never be paroled, especially given his prior murder conviction in Mississippi. To that end, the defense incorporated into their mitigation strategy the fact that the Petitioner stood convicted of another first degree murder. Lead sentencing counsel said they used the prior murder conviction to bolster their case to the jury that even if the Petitioner were paroled in Tennessee, he would be sent directly to Mississippi to serve his other life sentence. Lead sentencing counsel did not think his motion to strike that conviction as an aggravator would be successful, so they decided to "embrace it."

Defense counsel's strategy included generating empathy with the jury based upon evidence of the Petitioner's disadvantaged past and demonstrating the Petitioner would never be released from prison. The Petitioner initially did not want counsel to show the jury evidence of his troubled past. According to lead sentencing counsel, the Petitioner's family members also initially did not fully cooperate with defense counsel. Lead sentencing counsel said, however, that they eventually agreed to assist counsel and testify on the Petitioner's behalf. Lead sentencing counsel said the testimony by the Petitioner's family members was "incredible" and "very compelling." Lead sentencing counsel did not think the mental health aspect of mitigation in this case would have presented the same emotional impact as the testimony by the family members. He said having the family members tell stories about the Petitioner's history was much more compelling than an expert reciting results from an evaluation. Lead sentencing counsel stated, "I really think we put on what we thought was our spear point, and it wasn't enough." According to lead sentencing counsel, Dr. Angelillo's report supported their theory of pursuing empathy through the testimony of the Petitioner's family members. Lead sentencing counsel stated, "I don't think we would have put him on at all if we hadn't thought that, if it didn't move with our theme." The defense attempted to highlight the differences between the prison system in Mississippi, where the Petitioner was housed as a teenager, and the more structured environment in Tennessee, where the Petitioner was housed at Riverbend. According to lead sentencing counsel, the Petitioner had adapted well in his current prison environment, and showing the jury that fact was a main point of the defense.

Again, counsel had the benefit of reviewing all of the evaluations from the previous hearings. Lead sentencing counsel acknowledged that the State would have been allowed to cross-examine their expert witness if the defense questioned a witness about the previous evaluations. Lead sentencing counsel highlighted the statements made by Dr. Cox that counsel believed were "so atrocious." Although counsel did not want the State to exploit that information during cross-examination of their mental health expert, the defense was able to introduce Dr. Cox's opinion into evidence through the testimony of their investigator. That information supported the mitigation theory that the system in Mississippi failed the Petitioner. Lead sentencing counsel said, however, that if the State was allowed to question Dr. Angelillo about previous reports of antisocial personality disorder, their mitigation theory of a lack of future dangerousness in the prison setting would have been compromised.

Lead sentencing counsel was further questioned about a 1978 report from Mississippi State Hospital, where the Petitioner was evaluated after committing the previous murder. The report stated that the Petitioner "had no feelings, no sorrow about it." It also said the Petitioner "showed no signs or symptoms of a psychosis," his "psychological and neurological examination were within normal limits," "there is evidence of mild organic (neurological) deficiencies although I don't believe it is

- 13 -

interfering with him in a major way at this time," and the Petitioner possessed "a moderately disturbed personality with a marginal adjustment." The report diagnosed the Petitioner "as a schizoid personality with possible organic pathology [sic] present." Psychological testing at that time "did not reveal any signs of organisity [sic] or a neurological deficit nor did the neurological examination." The report found that the Petitioner had a full scale IQ of 93, and "he was found to be without psychosis and the clinical impression was a personality disorder with antisocial features [and] he was competent and responsible." Lead sentencing counsel said he reviewed that report prior to the resentencing hearing and thought its findings would have contradicted any allegation the defense asserted concerning the Petitioner's neurological deficits. He reiterated that an evaluation of antisocial personality would not have benefitted their theory of mitigation.

Lead sentencing counsel talked to defense counsel from the first resentencing hearing about their theory of mitigation before deciding on the approach to take during the second resentencing hearing. Prior to that hearing, counsel filed a notice of potential expert witnesses they considered calling to testify about how serotonin levels related to human behavior. Lead sentencing counsel said that although they had already ruled out that mitigation approach, they wanted the option to change their minds. Lead sentencing counsel also stated that Dr. Angelillo was provided a summary of the defense theory prior to the hearing.

Sentencing co-counsel testified that he reviewed all of the files and records from the previous hearings in this case. He also spoke with counsel from the first resentencing hearing. Sentencing co-counsel said they had the benefit of Ms. Shettles, who also worked on the first resentencing hearing. Sentencing co-counsel considered the defense a team effort wherein everyone involved in the case shared thoughts and ideas about how to proceed with the presentation of mitigating evidence. Sentencing co-counsel confirmed that the defense team discussed using mental health experts but ultimately decided against that particular approach. Sentencing co-counsel summarized their theory of defense as follows:

> [The Petitioner] never had a chance to begin with, from his early childhood, from the horrible family situation, to the torture, to the institution he was sent to in Mississippi that was shut down by the Federal Government for essentially torturing children, to incarceration at Parchman, how he was removed from Parchman and why. How he, once he was re-institutionalized, thrived, and he wasn't a danger to anybody where he was.

> And part of the defense, and I think we put on proof that, realistically, [the Petitioner] was never going to get out of prison with the Tennessee conviction and the Mississippi conviction, and that that was sufficient punishment.

Regarding the Petitioner's mental health, sentencing co-counsel testified:

> [The Petitioner] had a long history of – of evaluations and being looked at, and there was a lot of information in there. The danger in my opinion with these older cases is, if I come in with an expert that is new to the case and he comes up with something that is much more magnificent than anybody else has ever seen, I think it's disingenuous to the jury sometimes, and I think it appears to be bought and paid for.

> It – from what we had seen earlier in the information we had, could I have found a doctor to – to get up here to the jury and say that that all greatly affected him? Probably.

> But I think in the long run, when the State prosecutors were done with that doctor, it would have harmed [the Petitioner's] case more than it would have helped it because I don't think the earlier information would have really corroborated what the new doctor would have said and I only would have put him on if it had been really good, if that makes sense.

When asked how he could know "whether the information is really good without doing the examination," sentencing co-counsel replied,

> It didn't matter if it was good. If I knew if it was really, really good, if I had a doctor who was going to get up here and say that he did all this because he was brain damaged and all of this and all of that, that would have directly gone against what every other doctor had said in the past, and I think that testimony would have looked like it was bought and paid for.

Sentencing co-counsel also thought any residual doubt defense during resentencing had the potential of backfiring. Sentencing co-counsel admitted that the instruction informing the jury that the Petitioner would be eligible for parole after serving twenty-five years of a life sentence was "the single hardest thing some juror's going to be able to get past." He also confirmed that they decided not to move to strike the Petitioner's prior murder conviction for consideration as an aggravating circumstance, in part, because it was part of their strategy to convince the jury the Petitioner would never be released from prison. Sentencing co-counsel, though, did not otherwise believe there was a legal basis for their position. According to sentencing co-counsel, Ms. Shettles testified as an expert about her experience working for the Board of Probation and Parole for twenty years, and it was her opinion that the Petitioner would never be paroled.

During cross-examination, sentencing co-counsel opined, "[W]e had very powerful in my opinion mitigation on his life. Very strong witnesses testifying to the

things that had happened to him as a child, the trouble he got into, how he thrived in prison when he was there, and basically, there was no reason to execute him." He agreed with lead sentencing counsel that no "mental health expert ever could have gotten the emotion that we were able to get out of" the lay witnesses. According to sentencing co-counsel's impression, the jury was able to understand the Petitioner as "a very damaged human being." Sentencing co-counsel said the defense tried to show the jury how the system in Mississippi failed the Petitioner because he never received the help recommended by the mental health experts who evaluated him. In contrast, they were able to show the jury how he had adjusted well to the prison environment in Tennessee. Sentencing co-counsel did not believe presenting evidence both that the Petitioner acted violently in the past because of low serotonin levels or brain damage and that he adjusted well in a controlled prison setting would have been an effective or complementary defense. Sentencing co-counsel did not want to provide "ammunition for the State" by relying upon a diagnosis of

> borderline personality, antisocial behavior. Things like that are never helpful to a defendant and our other stuff showed that that wasn't the way he behaved, and you know, it was a good theory. The system had failed him, but once the system essentially fixed him when he was incarcerated and when he was structured and when he was provided what he needed, he thrived. I mean, he – he – he was a model inmate.

Trial co-counsel testified that she and lead trial counsel were both employed by the Office of the Public Defender at the time of trial and that lead trial counsel previously served as the District Public Defender. Lead trial counsel was deceased at the time of the evidentiary hearing. In addition to the two attorneys, the Petitioner had the benefit of a factual investigator and a mitigation specialist. Trial co-counsel said the Petitioner was examined by Dr. John Hutson, a clinical psychologist, prior to trial. Trial co-counsel recalled reviewing the Mississippi records related to the Petitioner's prior mental health evaluations. She also remembered requesting discovery from the prosecution, but she did not think they received the entire police investigation file. Trial co-counsel said, though, that if the police file identified other people who were in the parking garage at the time, but they were not detained as suspects by the police, then counsel probably would not have pursued them. Defense counsel did not seek to have the Petitioner's signed statement analyzed by a forensic document examiner.

Trial co-counsel testified on cross-examination that she did not think counsel was unprofessional for failing to move for a continuance due to lead trial counsel's health. She did not notice anything concerning about his health, and she stated that if lead trial counsel did not believe he could continue, he would have said so. According to trial co-counsel, the prosecutor on the case at the time would have allowed defense counsel to review the State's entire case file. She also confirmed that the record of the original trial reflected that defense counsel was given the opportunity to review everything the State

possessed in its file.

According to trial co-counsel, the defense team did not notice anything peculiar after interacting with the Petitioner that gave them concern about his mental health. The defense attempted to get any relevant records from the Petitioner's past, including prison and mental health records. One of the first records trial co-counsel reviewed from 1978 opined that the petitioner "was without psychosis, responsible and competent to stand trial" and that "psychological and neurological examinations were within normal limits." Trial co-counsel also learned that the Petitioner earned his G.E.D. in prison in Mississippi and completed some junior college courses. Trial co-counsel said Dr. Hutson's finding of a personality disorder was not helpful. According to trial co-counsel, the Petitioner's family members did not want to testify on his behalf.

Trial co-counsel testified that the decision making process of the defense team was influenced by the information about the case known to them at the time, including the details contained in the Petitioner's confession. As such, trial co-counsel did not see any benefit to testing the clothing the Petitioner wore during the murder. Similarly, she saw no reason to test the hair samples found in the victim's hand or the blood samples from the parking garage. Despite being unsuccessful in moving to suppress the Petitioner's statement, the defense theory during the guilt phase of the trial was that the Petitioner was coerced into confessing.

Betsy Chandler worked at Parchman Prison in Mississippi from 1985 until 2005. She worked in the law library and as a case manager. Ms. Chandler remembered the Petitioner when he was housed at the prison, and she remembered he was victimized by other inmates because he was younger and smaller. She did not remember him receiving many visitors or receiving items from people outside the prison. According to Ms. Chandler, the Petitioner was "emotionally needy" and "worrisome." She also identified a report detailing the Petitioner's placement into protective custody because he was accused of rape and being a problem inmate. Frank Nobles was housed at Parchman Prison with the Petitioner. He testified about the violent nature of the prison environment and how the weaker inmates were victimized by the stronger ones. Mr. Nobles described the Petitioner as a weaker inmate. Robert Tubwell was also housed with the Petitioner at Parchman Prison. Mr. Tubwell remembered the Petitioner seeking the protection of two stronger inmates at different times. The stronger inmates in the prison would typically require things in return for offering protection such as sexual favors, washing clothes, and running errands. The weaker inmates would be referred to as "sons" by their protectors. Mr. Tubwell saw the Petitioner wear makeup and dress in women's clothing one or two times. Mr. Tubwell also remembered the Petitioner filing grievances with guards. According to Mr. Tubwell, inmates often retaliated against inmates who filed grievances against them.

Dr. Tora Brawley, a clinical neuropsychologist, testified on behalf of the

Petitioner. She examined the Petitioner prior to the evidentiary hearing and had the benefit of reviewing records from the Petitioner's past. Dr. Brawley administered the Wechsler Adult Intelligence Scale IV test, which measured IQ as well as different areas of brain function. The Petitioner measured a full-scale IQ of 94, which was average according to Dr. Brawley. His verbal comprehension score was 89, which was low average, and his perceptual reasoning score was 104, which was average. However, Dr. Brawley said the discrepancy between the verbal and performance skills was statistically and clinically significant. She also administered the Wechsler Memory Scale IV test, which examined memory function. The Petitioner performed in the ninth and sixteenth percentiles on verbal memory tests, but he performed in the fiftieth and seventy-fifth percentiles on visual memory tests. The Petitioner performed poorly on non-verbal abstract reasoning and verbal learning tests. He scored in the fourth percentile on a verbal fluency test. Dr. Brawley also observed some asymmetry between the Petitioner's left and right hands after administering a simple test that measured the Petitioner's manual motor speed.

Based upon her examination of the Petitioner, Dr. Brawley concluded that he had significant asymmetries in several areas of cognition to include memory, intellectual, and motor functioning. She also observed deficits in his frontal lobe functioning and mental flexibility. Those deficits most probably affected the Petitioner's behavior and personality over his life span and could have significantly impacted his judgment, impulsivity, and decision making. Dr. Brawley said the results from some of the Petitioner's past records corresponded with her findings. She also said the fact that the Petitioner previously escaped from prison would be consistent with his inability to make good choices. She stated, however, that the Petitioner's issues and deficits had likely improved over time because he had been confined for many years in a very structured prison environment in Tennessee. According to Dr. Brawley, neuropsychological impairment was not synonymous with mental retardation.

On cross-examination, Dr. Brawley testified that drug use could contribute to neurological damage. She said the Petitioner suffered head trauma, which resulted in loss of consciousness, on three occasions when he was between seventeen and twenty-one years old. Dr. Brawley said the Petitioner's neurological damage may or may not have contributed to his actions at the time of the murder. During the examination, the Petitioner informed Dr. Brawley that two of the top three stressors he faced at that time were being "locked up for something [he] didn't do" and "trying to get the work records of Tanya D. Tiller," both of which related to his guilt.

Alysandra Finn, an investigator with the Office of the Post-Conviction Defender, was assigned to investigate the mitigating evidence on behalf of the Petitioner. She testified that she uncovered information not reported by Glori Shettles during the second resentencing hearing. The Petitioner's biological father, Richard Norman Smith, was born out of wedlock. Mr. Smith did not have a good relationship with his mother, who

committed suicide when Mr. Smith was sixteen years old. Mr. Smith's stepfather started binge drinking soon thereafter. Mr. Smith's brother and nephew also committed suicide. Mr. Smith wreaked havoc in the community as a teenager and was eventually placed in a juvenile facility.

Ms. Finn also interviewed the Petitioner's biological mother, Holly Taylor (Nellie Ruth Holly). Ms. Taylor's father was extremely abusive to her and her sister and acted violently towards others in the community. Ms. Taylor's father raped his daughter from another marriage and was eventually murdered in prison. Ms. Taylor's mother was described as mean and uncaring. Ms. Taylor's mother remarried, and her new husband sexually abused Ms. Taylor and her sister. According to Ms. Finn, Ms. Taylor was described as a mean child. When Ms. Finn interviewed Ms. Taylor, she was living in filth in a tiny trailer.

The Petitioner's parents were teenagers when they met. By the time they married, they were both drinking and partying regularly. Ms. Taylor continued to drink during her pregnancies. The Petitioner had an older sister and a younger sister. Neither parent was described as caring or loving. The Petitioner's mother informed Ms. Finn that she was a lot meaner to the children than their father was. The Petitioner's father physically abused the Petitioner's mother. The family eventually settled in Mississippi. Ms. Taylor abandoned the family when the Petitioner was one and one-half years old. The Petitioner's father then had to take on additional employment, so he would leave the children with a neighbor, Gladys McClendon. The Petitioner and his sisters were not well-cared for by their father; the Petitioner was seen with cigarette burn marks on his arms and feet at the time. Ms. McClendon's home was the de facto day care for the neighborhood. The Petitioner and his sisters eventually spent more time living with Ms. McClendon. The Petitioner was finally adopted when he was about two years old by Ms. McClendon's daughter, Shirley[1], and Shirley's husband, Jimmy Odom. The Petitioner's two sisters were adopted by other member of the community. According to Ms. Finn, neither fared much better in their adoptive households than the Petitioner. At the time of her investigation, Ms. Finn said both sisters suffered from depression. Mr. Smith resisted the adoptions at first but ultimately agreed when he was threatened with being reported for sexually abusing his daughters. The Petitioner's biological parents attempted to reconcile at some point but to no avail.

Shirley was fifteen when she married Jimmy Odom, who was sixteen. They had three biological children together. Jimmy Odom had just been released from prison when the Petitioner arrived in the family. The Odoms were described as incompetent parents. Jimmy Odom was always partying, and Shirley Odom "had no control over the house. It was filthy." Jimmy Odom was known to be a womanizer, and the Odoms had an abusive

---

[1] Because some of the Petitioner's family members share a surname, we will refer to them by their first names for clarity. We mean no disrespect to these individuals.

and volatile relationship. They eventually divorced when the Petitioner was four years old, and Gladys McClendon resumed primary responsibility for the Petitioner. She also cared for many other children at the same time. Ms. Finn described the scene at the McClendon house as "constant chaos." Ms. McClendon was extremely cruel to the Petitioner. She did not want him around and would beat him.

Shirley Odom married a man named Marvin Bruce when the Petitioner was about five years old. Mr. Bruce was an alcoholic, and he and Shirley had three biological children together. According to Ms. Finn, the Petitioner was treated as the outcast and severely abused by Mr. Bruce and Shirley. The Petitioner wet the bed until he was about nine years old, and Mr. Bruce would hang the sheets outside of the house to embarrass the Petitioner. Shirley also would humiliate the Petitioner when he wet the bed by pulling down his pants and smacking his "privates" in front of the other children. Shirley drank during the day. The house was a mess, and there were times when there was no food in the house. The children were filthy and were not taught how to maintain any personal hygiene. The police were frequently called to the home.

When the Petitioner was twelve years old, he and his brother Larry would solicit oral sex for money. According to Ms. Finn, the Petitioner also started living on the streets at that age. At a young age, the Petitioner was reported to have started having "spells" during which he would "check out" and would not respond when called. The Petitioner was placed in special education in school. The Petitioner stayed in trouble with the police and eventually was placed in Columbia Training School, a juvenile facility. The Petitioner was described as malnourished at the time. The juveniles were punished if they attempted to escape, and the Petitioner spent one hundred and twenty days in the "hole" in isolation for running away. The Petitioner received no mail or visitors when he was at Columbia. The Petitioner was evaluated by Dr. Cox once before he entered the training school and once while in attendance. Dr. Cox requested that the Petitioner undergo an EEG, which Ms. Finn said was unusual.

After the Petitioner left the juvenile training school, he was arrested and convicted of homicide in 1978 and incarcerated at Parchman Prison to serve a life sentence. Ms. Finn described the conditions at the prison at that time. Hundreds of inmates were housed in individual units consisting of open bunk bedding. Violence among the inmates apparently was widespread, and the smaller white inmates were particular targets. Ms. Finn described the relationships between the "gal boys" or "sons," the weaker inmates, and their "protectors" or "daddies," the stronger inmates. The "sons" would exchange sexual favors for protection. "Punks," as they were called, were former "sons" who became "free game" to the rest of the inmates. According to Ms. Finn, the Petitioner was described as having been both a "son" and a "punk." As part of the role of "son," the Petitioner at times was forced to wear makeup and women's clothing. Ms. Finn also said the guards routinely beat the inmates.

The Petitioner's brother, Larry, was incarcerated at Parchman with the Petitioner, and he attempted suicide a couple of times. According to Ms. Finn, Larry had similar experiences as the Petitioner because of his size. The Petitioner's other brother, Jimmy, Jr., who also was housed at Parchman, associated himself with the Aryan Brotherhood, became an "enforcer," and was able to protect himself. Ms. Finn learned that Jimmy, Jr., did not associate with the Petitioner or Larry because of their status as "sons" and "punks" and, thus, did not protect them for fear of retaliation from his gang.

Ms. Finn referred to reports that the Petitioner had been assaulted in prison. According to Ms. Finn, however, the prisoners who reported assaults faced ridicule and retaliation from other inmates and the guards because the reports apparently were not kept confidential. Records reflected that the Petitioner contracted syphilis at Parchman. Ms. Finn said that although his two brothers received visitors in prison, the Petitioner did not. The Petitioner was eventually transferred from Parchman Prison to a county jail. According to Ms. Finn's findings, the Petitioner was transferred because he was assisting with an official investigation. The Petitioner escaped from that jail prior to committing the murder in this case.

Dr. James Merikangas testified for the Petitioner as an expert in neurology and psychiatry. Dr. Merikangas reviewed the Petitioner's numerous historical reports and conducted an interview with the Petitioner. He also conducted a neurological examination, including an MRI (Magnetic Resonance Imaging) and PET scan, as well as a physical examination of the Petitioner. Dr. Merikangas said executive functioning, which was the ability to plan and control behavior, was located in the frontal lobe of the brain. Based upon his review of the Petitioner's records, including reports of the Petitioner's mother drinking while pregnant, a high fever the Petitioner experienced as a child, and the various head injuries the Petitioner suffered, as well as his initial physical examination of the Petitioner, Dr. Merikangas concluded that the Petitioner had some sort of brain damage which needed to be explored further.

The MRI, which according to Dr. Merikangas examined the anatomy of the brain, revealed loss of brain tissue in the Petitioner's temporal lobe. In addition, the Petitioner had an enlarged third ventricle which reflected a loss of cognitive functioning. Dr. Merikangas also identified scarring of the brain tissue, which likely was caused by head injuries, as well as evidence of damage associated with fetal alcohol syndrome among other things. Dr. Merikangas testified that, based upon the discrepancy between the Petitioner's verbal and performance IQ scores, there was a disconnect between the functionality of the Petitioner's left and right brain hemispheres. The PET scan, which measured brain function, revealed that the Petitioner's temporal lobes were not functioning as well as the rest of his brain. Dr. Merikangas said the temporal lobes, which controlled behavior, were likely to be damaged during head trauma. The PET scan also revealed asymmetry between the functionality of the left and right hemispheres of the Petitioner's brain. Dr. Merikangas also administered a Diffusion Tensor Imaging

(DTI) test, which was a type of MRI that examined the flow of fluid in the axons, or nerve connections in the brain. The DTI revealed some problem with the connections between the two sides of the Petitioner's brain.

Reviewing a previous IQ score the Petitioner received in 1974, Dr. Merikangas testified that the full-scale score of 81 was just above borderline mental retardation and that the thirty-three-point difference between the verbal and performance scores was highly significant and suggestive of brain damage. Dr. Merikangas also reviewed a report from a 1976 EEG, which revealed evidence of brain damage. According to Dr. Merikangas, the fact that the Petitioner had an EEG a couple of years later, which was normal, did not necessarily discount the earlier abnormal results. Although the Petitioner was treated for syphilis at a young age, Dr. Merikangas could not comment on whether the disease affected his brain.

Dr. Merikangas testified that the test results revealed brain damage, which the Petitioner probably had his entire life. When asked by the court what it meant to have brain damage, Dr. Merikangas answered, "It generally means that your intelligence is not as good as it should be, and your ability to plan and carry out actions or to control your impulses is not as good as it should be." According to Dr. Merikangas, studies showed that emotional and psychological abuse of children could inhibit the development of their brains. In the Petitioner's case, Dr. Merikangas attributed his brain damage to a combination of his long-term history of physical, sexual, and psychological abuse and physical head trauma, i.e., both congenital and acquired brain damage. Dr. Merikangas testified that "many parts" of the Petitioner's brain were damaged. He ruled out a diagnosis of personality disorder.

During cross-examination, Dr. Merikangas testified that he was not aware the Petitioner escaped from Parchman Prison in 1981. He further testified that knowledge of that information would not change his opinion. He said, though, that the Petitioner's brain damage would not prevent him from attempting to escape in the future. Dr. Merikangas did not opine whether the Petitioner's brain damage prevented him from knowing right from wrong, and he did not comment on whether the Petitioner's brain damage caused him to commit the two murders. Dr. Merikangas opined that drug use did not cause the Petitioner's brain damage. Although Dr. Merikangas did not think the Petitioner's brain damage had improved any, he said the Petitioner's behavior had improved while on death row. Dr. Merikangas acknowledged that the Petitioner had a subsequent full-scale IQ score in the 90s, but he also opined that a similar discrepancy between the verbal and performance scores indicated brain damage. Dr. Merikangas could not explain why the Petitioner had two different readings from EEGs conducted in 1976 and 1978, but he said they were not relevant to his diagnosis.

Sean Lester, the Custodian of Records for the Shelby County Medical Examiner's Office, testified for the State. Mr. Lester was asked to identify any evidence remaining

from the autopsy of the victim in this case. He located three items: two glass vacuum containers, one labeled "rectal swabs" and one labeled "vaginal swabs," and a sealed envelope labeled "hair and fiber from right hand." To Mr. Lester's knowledge, there had never been a request to test those samples for DNA. James Hill, an officer with the Memphis Police Department's Latent Fingerprint Section, provided for the record in this case all of the fingerprint-related evidence retained by the department. William D. Merritt, an investigator with the Shelby County District Attorney General's Office, provided for the record in this case all of the residual evidence remaining in the custody of the trial court clerk that was not introduced during any of the earlier trials.

Glori Shettles testified on behalf of the State. She worked for Inquisitor, Inc., for twenty-one and one-half years as a mitigation investigator prior to working for the Shelby County Public Defender's Office. She said that she worked on approximately ninety capital cases during her career and that she worked with defense counsel during the Petitioner's first and second resentencing hearings. According to Ms. Shettles, the attorneys made their own arrangements for expert witnesses during the first resentencing hearing. She said, though, that she obtained some of the Petitioner's records related to his mental health. Ms. Shettles said that, having worked on both hearings, she had an advantage in preparing mitigating evidence during the second resentencing hearing because she did not have to duplicate some of the investigation. She prepared a comprehensive mitigation timeline of the Petitioner's history to give counsel in preparation of the hearing. Ms. Shettles further said she had difficulty prior to the first resentencing hearing soliciting information and assistance from the Petitioner's family, but she said she experienced better cooperation from the family members during her work on the second resentencing hearing.

Ms. Shettles thought she developed a good working relationship with lead sentencing counsel and sentencing co-counsel. Ms. Shettles said both attorneys were very responsive and maintained open lines of communication. She said she was much more involved in the mental health aspect of mitigation during the second resentencing hearing than the first, and she identified the several experts she contacted during her investigation. Ms. Shettles also attested to the amount of time she spent on her investigation into potential mental health evidence. She recommended experts who counsel ultimately decided not to rely upon at the hearing. Nevertheless, Ms. Shettles testified that her investigation into the Petitioner's background was as thorough as any other case in which she had participated.

## II. Analysis

The Petitioner's post-conviction petition is governed by the Post-Conviction Procedure Act. *See* Tenn. Code Ann. §§ 40-30-101 to -122. To obtain post-conviction relief, a petitioner must show that his or her conviction or sentence is void or voidable because of the abridgment of a constitutional right. Tenn. Code Ann. § 40-30-103. The

petitioner must establish the factual allegations contained in the petition by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(2)(f). Evidence is clear and convincing when there is no serious or substantial doubt about the accuracy of the conclusions drawn from the evidence. *Hicks v. State*, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998).

Once the post-conviction court rules on the petition, its findings of fact are conclusive on appeal unless the evidence preponderates against them. *State v. Nichols*, 90 S.W.3d 576, 586 (Tenn. 2002) (citing *State v. Burns*, 6 S.W.3d 453, 461 (Tenn.1999)); *Cooper v. State*, 849 S.W.2d 744, 746 (Tenn. 1993). The Petitioner has the burden of establishing the evidence preponderates against the post-conviction court's findings. *Henley v. State*, 960 S.W.2d 572, 579 (Tenn. 1997). This court may not re-weigh or reevaluate the evidence or substitute its inferences for those drawn by the post-conviction court. *Nichols*, 90 S.W.3d at 586. Furthermore, the credibility of the witnesses and the weight and value to be afforded their testimony are questions to be resolved by the post-conviction court. *Bates v. State*, 973 S.W.2d 615, 631 (Tenn. Crim. App. 1997).

The Petitioner challenges aspects of his original trial attorneys' representation as well as the representation of his attorneys during the third sentencing hearing. He also presents issues related to the conduct of the 1992 trial, the 2007 resentencing hearing, and the post-conviction evidentiary hearing, as well as familiar issues against the imposition of the death penalty. For the sake of clarity in the opinion, we have reorganized the order of the issues the Petitioner presents in his appellate brief.

A. Ineffective Assistance of Counsel

Claims of ineffective assistance of counsel are regarded as mixed questions of law and fact. *State v. Honeycutt*, 54 S.W.3d 762, 766-67 (Tenn. 2001); *Burns*, 6 S.W.3d at 461. As such, the post-conviction court's findings of fact underlying a claim of ineffective assistance of counsel are reviewed under a de novo standard, accompanied by a presumption that the findings are correct unless the preponderance of the evidence is otherwise. *Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001) (citing Tenn. R. App. P. 13(d)). However, a post-conviction court's conclusions of law are reviewed under a purely de novo standard, with no presumption of correctness. *Id*.

The Sixth Amendment provides, in pertinent part, "In all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense." U.S. Const. amend. VI. This right to counsel is "'so fundamental and essential to a fair trial, and so, to due process of law, that it is made obligatory upon the States by the Fourteenth Amendment.'" *Gideon v. Wainwright*, 372 U.S. 335, 340 (1963) (quoting *Betts v. Brady*, 316 U.S. 455, 465 (1942)). Inherent in the right to counsel is the right to the effective assistance of counsel. *Cuyler v. Sullivan*, 446 U.S. 335, 344 (1980). "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct

so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland v. Washington*, 466 U.S. 668, 686 (1984); *see Combs v. Coyle*, 205 F.3d 269, 277 (6th Cir. 2000).

The United States Supreme Court has adopted a two-prong test to evaluate a claim of ineffectiveness:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Strickland*, 466 U.S. at 687. The performance prong of the *Strickland* test requires a showing that counsel's representation fell below an objective standard of reasonableness, or "outside the wide range of professionally competent assistance." *Id.* at 690. "Judicial scrutiny of performance is highly deferential, and '[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.'" *Combs*, 205 F.3d at 278 (quoting *Strickland*, 466 U.S. at 689).

Upon reviewing claims of ineffective assistance of counsel, courts "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland*, 466 U .S. at 689. Additionally, the courts will defer to trial strategy or tactical choices if they are informed ones based upon adequate preparation. *Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982). Finally, we note that criminal defendants are not entitled to perfect representation, only constitutionally adequate representation. *Denton v. State*, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). In other words, "in considering claims of ineffective assistance of counsel, 'we address not what is prudent or appropriate, but only what is constitutionally compelled.'" *Burger v. Kemp*, 483 U.S. 776, 794 (1987) (quoting *United States v. Cronic*, 466 U.S. 648, 655 n.38 (1984)). Notwithstanding, we recognize that "[o]ur duty to search for constitutional error with painstaking care is never more exacting than it is in a capital case." *Id.* at 785.

If a petitioner shows that counsel's performance fell below a reasonable standard, then he or she must satisfy the prejudice prong of the *Strickland* test by demonstrating "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. at 694. "A reasonable

probability is a probability sufficient to undermine confidence in the outcome." *Id.* In evaluating whether a petitioner satisfies the prejudice prong, this court must determine "whether counsel's deficient performance render[ed] the result of the trial unreliable or the proceeding fundamentally unfair." *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993) (citing *Strickland*, 466 U.S. at 687). In other words, a petitioner must establish the deficiency of counsel was of such a degree that it deprived the petitioner of a fair sentencing hearing and called into question the reliability of the outcome. *Nichols*, 90 S.W.3d at 587. That is, the evidence stemming from the failure to prepare a sound defense or to present witnesses must be significant, but it does not necessarily follow that the trial would have otherwise resulted in a lesser sentence. *State v. Zimmerman*, 823 S.W.2d 220, 225 (Tenn. Crim. App. 1991). "A reasonable probability of being found guilty of a lesser charge, or a shorter sentence, satisfies the second prong in *Strickland*." *Id.* Similarly, a petitioner must show "'there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of the aggravating and mitigating circumstances did not warrant death.'" *Henley*, 960 S.W.2d at 579-80 (quoting *Strickland*, 466 U.S. at 695).

Reviewing courts must indulge a strong presumption the conduct of trial counsel falls within the wide range of reasonable professional assistance. *Strickland*, 466 U.S. at 689. Our supreme court has stated:

> "Hindsight can always be utilized by those not in the fray so as to cast doubt on trial tactics a lawyer has used. Trial counsel's strategy will vary even among the most skilled lawyers. When that judgment exercised turns out to be wrong or even poorly advised, this fact alone cannot support a belated claim of ineffective counsel."

*Hellard*, 629 S.W.2d at 9 (quoting *Robinson v. United States*, 448 F.2d 1255, 1256 (8th Cir. 1971)). "It cannot be said that incompetent representation has occurred merely because other lawyers, judging from hindsight, could have made a better choice of tactics." *Id.* This court must defer to counsel's trial strategy and tactical choices when they are informed ones based upon adequate preparation. *Id.*

As noted earlier, criminal defendants are not entitled to perfect representation, only constitutionally adequate representation. *Denton*, 945 S.W.2d at 796. "Thus, the fact that a particular strategy or tactic failed or even hurt the defense does not, alone, support a claim of ineffective assistance." *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992). Moreover, "an accused is not deprived of the effective assistance of counsel because a different procedure or strategy might have produced a different result." *Vermilye v. State*, 754 S.W.2d 82, 85 (Tenn. Crim. App. 1987).

**1992 Counsel**

1.  Jury Selection

    The Petitioner contends that his original trial counsel were ineffective for failing to utilize a jury questionnaire or retain an expert in jury selection, failing to ensure the jury could consider and give effect to mitigation evidence, failing to inquire about the prospective jurors' attitudes toward mental health defenses, and failing to question jurors about potential biases and other grounds for disqualification.

    This court has addressed the role of defense counsel during jury selection in a capital case:

    > Jury selection implicates an accused's state and federal constitutional rights to a competent, fair-minded, and unbiased jury. *See Smith v. State*, 357 S.W.3d 322, 347 (Tenn. 2011) (recognizing that "[b]oth the United States and the Tennessee Constitutions guarantee a criminal defendant the right to a trial by an impartial jury.") . . . The process of voir dire is aimed at enabling a defense lawyer (as well as a prosecutor) to purge the jury of members not meeting these criteria. *See United States v. Nell*, 526 F.2d 1223, 1229 (5th Cir. 1976) ("[T]he principal way this right [to an impartial jury] is implemented is through the system of challenges exercised during the voir dire of prospective jurors."); *Smith*, 357 S.W.3d at 347 (recognizing that "'[t]he ultimate goal of voir dire is to ensure that jurors are competent, unbiased and impartial.'") (quoting *State v. Hugueley*, 185 S.W.3d 356, 390 (appx) (Tenn. 2006) . . . . As emphasized by the United States Supreme Court,

    > > The process of voir dire is designed to cull from the venire persons who demonstrate that they cannot be fair to *either* side of the case. Clearly, the extremes must be eliminated – i.e., those who, in spite of the evidence, would automatically vote to convict or impose the death penalty or automatically vote to acquit or impose a life sentence.

    > *Morgan v. Illinois*, 504 U.S. 719, 734 n.7, 112 S. Ct. 2222 (1992) (quoting *Smith v. Balcom*, 660 F.2d 573, 578 (5th Cir. 1981)).

    > As the United States Court of Appeals for the Sixth Circuit has asserted, "[a]mong the most essential responsibilities of defense counsel is to protect his client's constitutional right to a fair and impartial jury by using voir dire to identify and ferret out jurors who are biased against the defense." *Miller v. Francis*, 269 F.3d 609, 615 (6th Cir. 2001). By posing appropriate questions to prospective jurors, a defense lawyer is able to exercise challenges in a manner that ensures the jury passes constitutional

muster. *See United States v. Blount*, 479 F.2d 650, 651 (6th Cir. 1973).

Despite its significance, a trial lawyer is "accorded particular deference when conducting voir dire" and his or her "actions during voir dire are considered to be matters of trial strategy." *Hughes v. United States*, 258 F.3d 453, 457 (6th Cir. 2001). Also, "[a] strategic decision cannot be the basis for a claim of ineffective assistance unless counsel's decision is shown to be so ill-chosen that it permeates the entire trial with obvious unfairness." *Id.* Thus, it is imperative for a petitioner claiming ineffective assistance of counsel during jury selection to demonstrate that the resulting jury was not impartial. *See Smith*, 357 S.W.3d at 348 (citing *James A. Dellinger v. State*, No. E2005-01485-CCA-R3-PD, 2007 WL 2428049, at *30 (Tenn. Crim. App., Aug. 28, 2007)).

*William Glenn Rogers v. State*, No. M2010-01987-CCA-R3-PD, 2012 WL 3776675, at *35-36 (Tenn. Crim. App. at Nashville, Aug. 30, 2012).

The post-conviction court ruled as follows on this particular claim of ineffective assistance of counsel:

Initially, this court notes [post-conviction] counsel asked attorney [trial co-counsel] very few questions about the jury selection in petitioner's case and presented little evidence in general relating to the selection of the jury in petitioner's case. As to his contention trial counsel should have utilized a jury questionnaire, this court finds petitioner has presented no evidence to support his claim prospective jurors' responses would have differed had a jury questionnaire been utilized. There simply was no proof presented at the post-conviction hearing to suggest prospective jurors would have been more candid in their responses if responding via a jury questionnaire. Moreover, this court notes juror questionnaires are discretionary and are routinely either denied or modified by trial courts. This was likely particularly true in the early 1990s. Thus, this court does not find trial counsel's failure to request a questionnaire, alone, falls so far below the accepted level of representation as to render their representation of petitioner ineffective. Petitioner also asserts absent a jury consultant, trial counsel failed to conduct adequate voir dire and failed to select a fair and impartial jury. However, this court finds petitioner has again failed to present evidence supporting his claim the jury was not fair and impartial based upon the failure of trial counsel to hire a jury consultant.

As to the issue of life qualifying the jury, this court finds, although trial counsel may not have extensively inquired into each potential jurors ability to consider mitigation and if appropriate impose a sentence less than

death, both the prosecution and the court thoroughly covered the sentencing process. Thus, even if this court were to find trial counsels' questioning of the jurors on this issue was deficient, given the jurors were properly informed by the court of their obligations to consider all forms of punishment and hold the state to their burden of proof, this court finds petitioner was not prejudiced by counsels' inaction.

We agree with the post-conviction court. The argument presented by the Petitioner in his brief on appeal on the issue of jury questionnaires and a selection expert consists solely of the following statement: "Mr. Odom's 1992 trial counsel failed to move for and/or utilize a jury questionnaire or retain expert assistance in jury selection." The Petitioner offers no other argument, citation to authorities, or appropriate references to the record in support thereof. This ground for relief must, therefore, be considered waived. *See* Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court."). In any event, the Petitioner has failed to demonstrate any actual prejudice resulting from counsels' failure to utilize questionnaires or an expert during jury selection. Nothing in the record suggests the jury impaneled was impartial. "It is incumbent upon the petitioner and his post-conviction counsel to demonstrate how a jury questionnaire or an expert in the field of jury selection might have made a difference." *Prentiss Phillips v. State*, No. W2004-01626-CCA-R3-PC, 2005 WL 1123612, at *6 (Tenn. Crim. App. at Jackson, May 12, 2005). This court held in *Prentiss Phillips* that, because the petitioner did not call a jury expert during the evidentiary hearing, it was unable to find prejudice. The same holds true here.

The Petitioner presents similarly meager arguments regarding counsel's questioning about jurors' attitudes toward mitigation and mental health defenses: "They also failed to ensure the jurors could consider and give effect to mitigation evidence, as required by *Morgan v. Illinois*, 504 U.S. 719 (1992). Further, they failed to inquire about the potential jurors' attitudes toward mental disorders and mental state defenses." These unsubstantiated assertions must also be considered waived. *See* Tenn. Ct. Crim. App. R. 10(b). Regardless, because the Petitioner was granted a new sentencing hearing following his initial direct appeal, no prejudice can be shown in this instance.

As to the questioning of specific jurors, the post-conviction court stated:

Petitioner also asserts trial counsel failed to inquire into potential bias of certain prospective jurors. Specially, he argues trial counsel failed to: (a) sufficiently rehabilitate Juror Bradley who stated he expected the defense team to prove petitioner's innocence; (b) sufficiently question Juror Christopher who was robbed at gunpoint while working as a bank teller; (c) sufficiently question Juror Davis who was also a victim of robbery; (d) question Juror Nettles, a robbery victim, and the mother of a Memphis

Police Officer who stated she believed a police officer's credibility was higher than the other witnesses. None of these witnesses testified at petitioner's post-conviction hearing and post-conviction counsel did not question attorney [trial co-counsel] about the defense teams questioning or lack of questioning of these jurors. Thus, this court finds even if trial counsel were ineffective in their questioning of the jurors, petitioner has failed to demonstrate he was prejudiced by counsels' inaction.

Citing *Smith v. State*, the post-conviction court held that bias cannot be presumed "absent either an affirmative statement of bias, willful concealment of bias, or failure to disclose information that would call into question the juror's bias." 357 S.W.3d at 348.

The Petitioner did not present any proof during the evidentiary hearing that would call into question trial counsel's performance with regard to the questioning of these jurors. Regardless, the trial transcript reveals that counsel did question each juror about whether their past experiences would affect their ability to remain impartial and neutral. Accordingly, the Petitioner's argument that "[d]efense counsel ignored these glaring biases" is without merit especially when all three jurors (Christopher, Davis, and Nettles) stated they could remain impartial despite their experiences. As to Juror Bradley, the Petitioner acknowledges that this juror was rehabilitated during voir dire. The Petitioner, however, did not ask trial co-counsel during the evidentiary hearing why a peremptory challenge was not used against that particular juror. Accordingly, it must be presumed that counsels' decision in that respect was reasonable trial strategy. Counsel cannot be deemed to have been ineffective in this instance. The Petitioner is not entitled to relief with respect to 1992 counsels' actions during jury selection.

2. Jury Instructions

The Petitioner contends that counsel were ineffective during the original trial for failing to object to the trial court's jury instruction, which listed first degree murder as the first option to consider and "not guilty" as the final option. As the post-conviction court observed, however, our supreme court has held that sequential jury instructions do not deprive a defendant of his or her constitutional right to a jury trial. *See State v. Davis*, 266 S.W.3d 896, 905 (Tenn. 2008). Accordingly, counsel cannot be deemed ineffective for failing to challenge the jury charge in this respect.

3. Motion to Suppress Statement

The Petitioner contends that his original trial counsel were ineffective for failing to argue competently that his statement to the police should have been suppressed. The Petitioner complains that counsel filed only three "boilerplate" motions to suppress the statement and did not present any evidence in support of their argument at the suppression hearing other than the testimony of the Petitioner himself. The Petitioner

- 30 -

argues that counsel should have presented evidence of his troubled past to demonstrate how he endured "reasonable fear and confusion during the nightlong interrogation." He also argues that his statement to the police would have been suppressed if the trial court had been aware of his brain damage.

The post-conviction court disagreed, stating:

> This court finds trial counsel were not ineffective in this regard. Attorney [trial co-counsel] testified the defense argued the statements were coerced but the trial court did not suppress the statement. However, although the statements were not suppressed, she stated, the defense team argued to the jury petitioner had been coerced by the police into giving a statement. Furthermore, as noted elsewhere in this order, counsel did have petitioner evaluated and Dr. Hutson did not indicate petitioner was suffering from any conditions which could support a challenge to the voluntariness or reliability of his confession. Likewise, neither Tora Brawley nor Dr. Merikangas could say with certainty petitioner's cognitive deficits would have precluded him from exercising a valid waiver and voluntarily providing a statement to police. The record in this case indicates[] petitioner had the cognitive ability to be deceptive during his police interrogation as he initially provided police with a false name. Petitioner was able to discuss the commission of the offense in great detail both with the police and with the defense team. Moreover, at the Motion to Suppress [hearing] Sergeant McWilliams testified the petitioner had indicated he understood his rights and stated the petitioner had never been threatened or coerced. Upon hearing all the proof the trial court found petitioner was not credible. This court finds nothing about the testimony offered by Dr. Merikangas or Brawley would have likely influenced the trial court's conclusion the statement was voluntarily and knowingly given. Thus, even if counsel were ineffective in failing to employ this strategy, this court finds petitioner has failed to demonstrate he was prejudiced by their inaction as it appears such an argument likely could not have been sustained.

Based upon our review of the record, we conclude that trial counsel were not ineffective in the handling of the motion to suppress. As noted above, the fact that a particular strategy or tactic failed does not equate with deficient performance. *Cooper*, 847 S.W.2d at 528. Trial counsel moved to suppress the statement but were simply unsuccessful in their attempt. Regardless, the Petitioner has not otherwise shown any resulting prejudice. "In order to show prejudice, [the] Petitioner must show by clear and convincing evidence that (1) a motion to suppress would have been granted and (2) there was a reasonable probability that the proceedings would have concluded differently if counsel had performed as suggested. *Vaughn v. State,* 202 S.W.3d 106, 120 (Tenn. 2006)

(citing *Strickland,* 466 U.S. at 687, 104 S. Ct. at 2064-65). "In essence, the petitioner should incorporate a motion to suppress within the proof presented at the post-conviction hearing." *Terrance Cecil v. State*, No. M2009-00671-CCA-R3-PC, 2011 WL 4012436, at *8 (Tenn. Crim. App. at Nashville, Sept. 12, 2011). Contrary to his argument, the Petitioner presented no clear and convincing evidence demonstrating a motion to suppress would have been granted under some alternate theory. Accordingly, we agree with the post-conviction court's findings in this respect. Although he challenged trial counsel's failure to contest the signature on the statement as being his own, he does not raise that issue on appeal. The Petitioner is not entitled to relief on this claim.

4. Presentation of Case

The Petitioner argues that counsel were ineffective during the guilt phase of the original trial because they presented no witnesses on his behalf and failed to effectively cross-examine the State's witnesses. As the State observes, the Petitioner does not now identify any potential witness trial counsel should have called to testify. In order to prevail on a claim of ineffective assistance of counsel for failure to call a witness at trial, a petitioner should present that witness at the post-conviction hearing. *Pylant v. State*, 263 S.W.3d 854, 869 (Tenn. 2008). "'As a general rule, this is the only way the petitioner can establish that . . . the failure to have a known witness present or call the witness to the stand resulted in the denial of critical evidence which inured to the prejudice of the petitioner.'" *Id*. (quoting *Black v. State,* 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990)).

As to the cross-examination of State witnesses, in the Petitioner's brief on appeal, he merely references the supplemental amended petition for post-conviction relief he filed in which he challenged counsel's failure "to effectively cross-examine police witnesses on the poor chain of custody and crime scene handling of fingerprint evidence." The post-conviction court concluded that the Petitioner failed to establish ineffective assistance of counsel on this ground:

> He argues within fifteen minutes of the first officers arriving on the scene, numerous police personnel were milling about the crime scene and several individuals has [sic] access to the interior of the car where his fingerprints were found. He contends trial counsel failed to ask any questions challenging the possible contamination of the crime scene. He further argues trial counsel were ineffective in questioning Officer William Lee regarding the methodology Lee used to lift the print implicating him in the crime. Specifically he argues trial counsel should have asked Lee about whether he photographed the print prior to the lift. Finally, petitioner contends trial counsel were ineffective in failing to question latent print examiner, James Holder, about the inherent subjectivity in latent print identification. . . .

- 32 -

This court finds petitioner has failed to present any proof in support of this allegation. There was no testimony about latent print examination presented at the post-conviction hearing. No evidence was presented demonstrating the crime scene was not properly secured; chain of custody properly maintained; or, the lifting and examination of the prints properly conducted. Moreover, in addition to the fingerprint evidence, petitioner gave a statement in which he admitted to being present at the crime scene and raping and stabbing the victim. Thus, even if counsel were [deficient] in failing to challenge the fingerprint evidence in his case, petitioner has failed to demonstrate he was prejudiced by counsel's inaction.

The Petitioner does not explain how the post-conviction court's ruling in this respect is erroneous; instead, he simply refers to the authority cited in his supplemental amended petition. In other words, the Petitioner offers no argument on appeal in support of his claim that trial counsel were ineffective for failing to cross-examine the State's witnesses effectively. The issue must therefore be considered waived on appeal. *See* Tenn. Ct. Crim. App. R. 10(b). Regardless, we agree with the post-conviction court that the Petitioner is otherwise unable to demonstrate any resulting prejudice.

5. Juror Question

The Petitioner argues that trial counsel should have objected during the guilt phase of the trial when a juror asked the medical examiner a question about the depth of one of the stab wounds to the victim in relation to the length of the blade on the knife found on the Petitioner at the time of his arrest. After testifying about the nature of the stab wounds to the victim, the medical examiner testified that, although he could not affirmatively state that the exact knife found on the Petitioner caused the wounds "to the exclusion of all others in the world," that knife was "quite consistent with producing the wounds" to the victim. At the conclusion of the medical examiner's testimony, a juror, with permission from the trial court, asked the medical examiner a question about the knife. The following is the entire verbal exchange between the juror and the medical examiner:

Juror: Yes, sir. Sir, could you tell me how long that blade is on that knife?

Witness: I would have to have a ruler to measure it. It looks like about three inches. (Pause) It appears to be about three inches, but I would have to have a ruler to actually measure it.

Juror: And you said the penetration was four inches –

Witness: That's correct.

Juror:  -- amongst the --

Witness:  What happens is that as the knife is penetrating the chest cavity there's some give to the chest cavity, so a three inch blade can produce a five inch deep wound.  It's because of that give.

Trial Judge:  All right, doctor, you may step down.

The Petitioner argues that the previously unsolicited testimony from the medical examiner prejudiced his defense.  The Petitioner cites *State v. Jeffries*, 644 S.W.2d 432 (Tenn. Crim. App. 1982), and Tennessee Rule of Criminal Procedure 24.1 in support of his argument.  The post-conviction court noted that Rule 24.1 was not adopted until 2003 and, thus, inapplicable to the Petitioner's claim.  The court also recognized that prior to the implementation of Rule 24.1, "although the practice was discouraged, there was no outright bar to juror questioning at the time of" the trial in 1992.  *See Byrge v. State*, 575 S.W.2d 292 (Tenn. Crim. App. 1978); *Raynor v. State*, 447 S.W.2d 391 (Tenn. Crim. App. 1969).

Initially, we agree with the State that the Petitioner has failed to carry his burden of establishing deficient performance on the part of trial counsel.  The Petitioner did not question trial co-counsel as to why trial counsel did not object when the trial court allowed the juror to question the witness.  Given that the knife blade was shorter than the depth of the stab wounds, the failure to object very well may have been tactical.

In any event, even if counsel should have objected, the post-conviction court correctly ruled that at the time of the Petitioner's trial, there was no absolute prohibition to a juror being permitted to question a witness.  As this court announced in *Byrge*, "[E]ach case must be judged on its own facts in determining whether error has been committed."  575 S.W.2d at 295.  Given the nature of the medical examiner's testimony and the limited line of questioning by the juror, the Petitioner has failed to demonstrate that the trial court would have sustained an objection to the juror's question.  To the extent the Petitioner couches his argument in terms of trial court error, said issue is waived because the Petitioner failed to raise it on direct appeal.  *See* Tenn. Code Ann. § 40-30-106(g).  Accordingly, the Petitioner is not entitled to relief on this ground.

6.  Investigation

The Petitioner contends that his original trial counsel "failed to investigate other suspects and evidence supporting an argument that someone else may have been responsible for the incident."  The testimony of trial co-counsel is summarized above.  She identified the members of the defense team, which included two attorneys and two investigators, and she described the team's strategy.  Trial co-counsel explained that the

decision making process was influenced by information about the case they already knew, including the Petitioner's confession. Upon review of the evidence presented in post-conviction, the post-conviction court concluded that the Petitioner failed to demonstrate how trial counsel were ineffective in their factual investigation: "Given the constraints on the defense based upon petitioner's confession to the crime and physical evidence confirming his presence at the crime scene, counsel chose the only strategy available to them and attempted to challenge the validity of petitioner's statement."

The Petitioner does not support his blanket statement on appeal that "the defense team failed to conduct any meaningful investigation into the State's case" with references to any other evidence his attorneys should have uncovered. We agree with the State that the Petitioner is required to demonstrate how counsel's action or inaction affected the outcome of the trial. The Petitioner has simply failed to carry his burden on this particular claim and is, therefore, not entitled to any relief. *See Tony Carruthers v. State*, No. W2006-00376-CCA-R3-PD, 2007 WL 4355481at *40 (Tenn. Crim. App. at Jackson, Dec. 12, 2007) ("Moreover, the petitioner did not produce any witnesses or evidence that pretrial counsel failed to investigate or uncover that would have altered the outcome of the trial."); *Demarcus Sheriff Smith v. State*, No. W2001-01353-CCA-R3-PC, 2002 WL 1482697, at *4 (Tenn. Crim. App. at Jackson, Mar. 8, 2002) ("If the claim is based upon a failure to properly investigate, then the evidence or witness must be produced so that the post-conviction court judge can properly evaluate the evidence or the witness.") This court may not guess as to what evidence further investigation may have uncovered. *Black*, 794 S.W.2d at 757.

**2007 Counsel**

1. Evidence of Petitioner's Neurological and Cognitive Impairments

The Petitioner claims that counsel rendered ineffective assistance during the third sentencing hearing by not timely investigating, obtaining, and presenting evidence of his neurological and cognitive impairments in mitigation despite the existence of evidence that those impairments had existed since 1974. The Petitioner argues that his attorneys waited too long before requesting the services of Dr. Angelillo to determine whether they overlooked anything regarding the Petitioner's mental health. He also argues that the fact that Dr. Angelillo was called as a witness belies counsel's assertion that they had ruled out a mental health strategy in mitigation. Dr. Angelillo could not offer a specific diagnosis about the Petitioner's potential brain damage. The Petitioner blames counsel for the incomplete evaluation because they did not retain the services of Dr. Angelillo in a timely manner. The Petitioner contends that a mental health expert would have complimented and contextualized lay witness and mitigation expert testimony by explaining that the Petitioner's traumatic experiences throughout childhood and adolescence compromised his brain development. The Petitioner also argues that counsel's fear of arming the prosecution with ammunition of a personality disorder

diagnosis came to fruition when Dr. Angelillo testified that the Petitioner had signs of a personality disorder.

The Petitioner insists that had counsel further investigated evidence of his brain damage, they would have been able to introduce the same type of evidence presented during the post-conviction hearing. Citing *Davidson v. State*, the Petitioner asserts, "Because mental illness can render a defendant less morally blameworthy, capital defense attorneys who possess compelling evidence of mental defects have an obligation to make a reasonable and fully-informed decision about presenting that evidence to the jury." 453 S.W.3d 386, 405 (Tenn. 2014). He argues that, despite numerous "red flags" in the reports found by counsel during their investigation, counsel did not subject him to neuropsychological testing, which would have revealed impairments in his executive functioning and cognitive deficits. According to the Petitioner's argument, had counsel presented the same type of mental health evidence he presented during the post-conviction hearing, there is a reasonable probability that at least one juror would have voted against the death penalty.

In addressing this claim, the post-conviction court issued the following findings:

At the post-conviction hearing [lead sentencing counsel] testified he believed the defense had considered retaining a neurologist and conducting a neurological examination of petitioner. However, [lead sentencing counsel] testified when petitioner was confined to Parchman he was given a battery of psychological tests and underwent a physical examination. He stated the petitioner's EEG was normal and the records indicate petitioner suffers from traits of anti-social personality disorder but had no other psychological issues. Testing was conducted by the Parchman officials to determine if petitioner possessed any "organicity" or neurological deficits. This examination found no neurological deficits and petitioner was found to have a full scale IQ of 93. [Lead sentencing counsel] stated much of this information had been discussed in petitioner's prior sentencing proceedings. In some cases, [lead sentencing counsel] testified he would raise the issue of brain damage as mitigation; however, in petitioner's case, the defense theory was centered on petitioner's future dangerousness and behavior within the prison system. [Lead sentencing counsel] testified the defense team considered these records in developing a theory of mitigation. However, he again pointed out a diagnosis of anti-social personality disorder directly undercut their arguments regarding future dangerousness. He further stated these records would have contradicted any claim the defense team would have made regarding neurological deficits or disorders.

[Lead sentencing counsel] testified petitioner underwent numerous examinations over the years. He stated Dr. Cox's assessment included

particularly damaging information, specifically as it relates to future dangerousness. Specifically, [lead sentencing counsel] recalled the records from Parchman prison further indicated petitioner stated, "maybe I did it for the joy of it," referring to firing the second shot which killed the victim in his Mississippi case and indicated "he had no feelings" or "sorrow" with regard to his actions. The report also referenced Dr. Cox's findings and indicated Dr. Cox had diagnosed petitioner as possible schizo personality. Attorney [sentencing co-counsel] likewise testified he was concerned about the information which might be elicited if the defense team pursued a defense based upon mental health and neurological deficits and stated based upon the prior evaluations. [Sic].

[Sentencing co-counsel] stated usually a defense team would want to put forward evidence of brain damage, if it exists, in a capital case. However, in petitioner's case, there was a long history of evaluations which did not support such a claim. To present such proof, according to [sentencing co-counsel], might appear disingenuous when considered in light of petitioner's complete mental health history; in such instances, there is the potential such testimony may appear to be "bought and paid for." Thus, the defense chose to present emotional testimony from the petitioner's family relating to his traumatic childhood and difficulty in the Mississippi juvenile system as well as a picture of petitioner as a productive member of the penal system and someone highly amendable to rehabilitation so long as he is confined to the prison system. [Sentencing co-counsel] testified he reviewed petitioner's complete mental health and medical history before rejecting a mitigation theory based upon mental health issues or cognitive impairments.

Both [lead sentencing counsel and sentencing co-counsel] testified there were numerous discussions about theories of mitigation and the proper strategy for the resentencing proceeding. He stated certain strategies were rejected such as a theory based upon serotonin levels, brain fingerprinting, and eventually a defense based upon supposed neuropsychological deficiencies or disorders. Likewise mitigation investigator Shettles testified numerous theories of mitigation were considered and rejected. Shettles specifically stated the defense team had the benefit of seeing the two prior proceedings and reviewing what worked and what did not work as a mitigation theory and indicated they formed the mitigation strategy based in part of the failures of those prior proceedings.

The court continued:

Petitioner argues trial counsel failed to provide the retained experts

- 37 -

all of the information needed to make a complete and proper assessment of his cognitive and psychological issues. Specifically, petitioner asserts 2007 trial counsel ignored their own mitigation expert's recommendation to obtain a neuropsychological expert to testify to his temporal lobe impairments. He asserts counsel did not request funding for a qualified expert until nearly two months prior to his resentencing hearing. He argues, because of trial counsels' failure to timely act, Dr. Angelillo did not have adequate time to review his extensive social history and mental health background and records. Petitioner contends Dr. Angelillo administered personality testing to petitioner but conducted no intelligence testing or neuropsychological testing. He contends the testimony of Dr. Angelillo at trial demonstrates his lack of preparedness. He asserts Dr. Angelillo informed the jury, because he did not have the data he had requested by prior mental health experts, notably a neuropsychological evaluation, a PET scan, and an EEG, he was unable to administer the tests necessary to evaluate petitioner to determine if he had a major mental disorder. He argues, as a consequence, Dr. Angelillo stated he had a difficult time determining how much of petitioner's impairments and behaviors were due to physical organic brain injury and how much was due to psychological issues.

At the post-conviction hearing, [lead sentencing counsel and sentencing co-counsel] testified Dr. Angelillo's testimony was not the primary focus of their mitigation strategy. Rather, counsel stated they attempted to present a theory of mitigation to the jury based upon the fact petitioner, due to his prior life sentence in Mississippi, would never be released from prison if the jury gave a life sentence. Counsel stated in conjunction with this argument they attempted to demonstrate petitioner had a good record while incarcerated and would not pose a danger to others if the jury spared his life. Trial counsel testified, in addition to this primary theory, the defense also used petitioner's difficult background to argue to the jury petitioner was essentially forsaken by the system. Both [lead sentencing counsel and sentencing co-counsel] indicated they felt this proof was best presented by the petitioner's family members and indicated the role of Dr. Angelillo was merely to enhance and support much of the information provided by the family and to support their assertion petitioner posed no real future dangerousness so long as he was incarcerated.

At trial, Dr. Angelillo testified the lack of sufficient mental health treatment afforded the petitioner as a child, the rejection he had experienced, and the physical and sexual abuse he had undergone all had a profound effect on his development. Dr. Angelillo testified the petitioner's time in the structured environment of Riverbend had been beneficial in

- 38 -

modifying his behaviors and modulating his ability to engage in constructive activities. Dr. Angelillo expressed an opinion the petitioner would continue to thrive in this structured environment if given a life sentence. In addition to the testimony of Dr. Angelillo, Glori Shettles, the mitigation investigator in both petitioner's 1999 and 2007 resentencing proceedings testified as an expert in parole procedures and stated it was very unlikely petitioner would ever be released from prison. Her statements were supported by other prison officials. Shettles spent extensive time interviewing and building relationships with petitioner's family. Due to these relationships Shettles was able to convince several family members to testify on petitioner's behalf. Petitioner's family described the extremely difficult, neglectful and abusive circumstances of petitioner's childhood and petitioner's brother described the conditions experienced by petitioner while incarcerated at Columbia Training School and Parchman Prison. Both attorneys and Shettles stated this testimony was incredibly powerful.

Considering a theory based upon cognitive impairments had been previously unsuccessfully utilized by 1999 trial counsel, this court does not find 2007 trial counsel were ineffective in failing to present an alternative mitigation theory. Under these circumstances, this court does not find the use of Dr. Angelillo as a compliment to this theory instead of as the centerpiece of mental health mitigation case was ineffective.

It appears the decision to forego a strictly or even primary mental health based theory of mitigation was made after extensive investigation by counsel and the mitigation investigator after substantive deliberations amongst the entire defense team. When asked about the decision at the post-conviction hearing, counsel provided reasoned responses explaining the exact investigation and considerations that went into making the decision to follow a different strategy than prior counsel. Specifically, attorney [sentencing co-counsel] acknowledged some of petitioner's prior mental health records contained warnings about petitioner's mental condition. However, according to [sentencing co-counsel], the fear of the defense team was the introduction of this information might show evidence of future dangerousness. He stated the goal of the defense team was to demonstrate petitioner had been failed by the system. He expressed his concern that, if petitioner was evaluated, the defense team could end up with an adverse diagnosis such as anti-social personality disorder.

Based upon all the proof presented at the post-conviction hearing, the testimony presented at petitioner's 2007 resentencing proceeding and the evidence presented at the prior proceedings, this court finds counsel

were not ineffective in their preparation an[d] utilization of Dr. Angelillo's services.

Our supreme court has summarized the following principles specific to mitigation in a capital case:

> Capital defendants possess a constitutionally protected right to provide the jury with mitigation evidence that humanizes the defendant and helps the jury accurately gauge the defendant's moral culpability. *Porter v. McCollum,* [558 U.S. 30, 41, 130 S. Ct. 447 (2009)]; *Williams v. Taylor,* [529 U.S. 362, 393, 120 S. Ct. 1495 (2000)]. Accordingly, capital defense attorneys have an obligation to conduct a thorough investigation of the defendant's background. *Williams v. Taylor,* 529 U.S. at 396, 120 S. Ct. 1495. Defense counsel should make an effort to discover all reasonably available mitigating evidence and all evidence to rebut any aggravating evidence that the State might introduce. *Wiggins v. Smith,* [539 U.S. 510 524, 123 S. Ct. 2527 (2003)].

> To provide effective representation, counsel must make either a reasonable investigation or a reasonable decision that particular investigations would be unhelpful or unnecessary. *Wiggins v. Smith,* 539 U.S. at 521, 123 S. Ct. 2527. Either way, counsel's decision must indicate a reasoned strategic judgment. *Wiggins v. Smith,* 539 U.S. at 526, 123 S. Ct. 2527. Defense counsel should investigate the defendant's medical history, educational history, employment and training history, family and social history, adult and juvenile correctional experiences, and religious and cultural influences. *Wiggins v. Smith,* 539 U.S. at 524, 123 S. Ct. 2527.

> Counsel is not required to investigate every conceivable line of mitigating evidence, no matter how unlikely it is to help the defense. Nor must counsel present mitigating evidence in every case. But "strategic choices made after less than complete investigation are reasonable only to the extent that reasonable professional judgments support the limitation of the investigation." *Wiggins v. Smith,* 539 U.S. at 533, 123 S. Ct. 2527 (internal quotation marks omitted). To determine whether counsel's actions were reasonable, a reviewing court should "consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." *Wiggins v. Smith,* 539 U.S. at 527, 123 S. Ct. 2527.

*Davidson*, 453 S.W.3d at 402.

The *Davidson* court concluded that trial counsel rendered ineffective assistance

during sentencing because they failed to present evidence of the defendant's brain damage and cognitive disorders. The Petitioner in the case at hand relies on *Davidson* for the proposition that his attorneys were ineffective for the same reason. Our supreme court reached its conclusion in *Davidson*, however, based upon counsel's "superficial investigation." *Id.* at 392. The attorneys in that case did not introduce any neuropsychological evidence in mitigation, and our supreme court concluded that their actions were not reasonably informed trial strategy but instead were the result of "inattention and a disturbing lack of time and resources." *Id.* at 404. Trial counsel testified that he was "overworked and understaffed" and that co-counsel "was suffering from significant health problems," which led the defense team to conduct a "cursory investigation" into the defendant's background. *Id.* at 398. Trial counsel "was unable to give a satisfactory explanation for his truncated investigation other than that he was harried and overworked," and he admitted that he should have pursued the defendant's mental health evidence further. *Id.* at 399. Counsel in *Davidson* also admitted that he probably did not completely review the report prepared by the mitigation specialist. *Id.* at 400. Moreover, Ms. Shettles, the same mitigation specialist used by the Petitioner's attorneys in this case, testified in *Davidson* that "she did 'very, very little. I was given a very, very brief period of time to complete tasks and I was asked specifically to do very, very few things.'" *Id.* at 399.

The testimony from the evidentiary hearing in this case presents an entirely different picture than that revealed in *Davidson*. Both attorneys testified about the extent of their representation in this case. They had the benefit of reviewing the records of two previous sentencing hearings as well as Ms. Shettles' exhaustive investigation into the Petitioner's background. Ms. Shettles testified that she had served as an investigator on approximately ninety death penalty cases, that she developed a good working relationship with defense counsel, and that her investigation into the Petitioner's background was as thorough as any other case in which she had participated. Lead sentencing counsel also testified that the information gathered by Ms. Shettles was the best mitigation he had ever received from an investigator in a capital case. Based upon our review of the record and the evidence presented at the hearing, there is no doubt the attorneys conducted a reasonably thorough investigation into the Petitioner's background.

Counsels' decision not to pursue a strictly mental health style of defense in mitigation was developed after they thoroughly investigated the Petitioner's background. Both attorneys testified that they were aware of the numerous reports included in Ms. Shettles' investigation that revealed evidence of potential brain damage. As recounted above in the fact section, both attorneys also explained why they chose not to focus their defense on the Petitioner's brain damage. Counsel feared that during cross-examination, the State would be able to exploit reports that the Petitioner made comments he committed the previous murder in Mississippi "for the joy of it" and "had no feelings, no sorrow about it." Likewise, counsel did not want to provide the State with the opportunity to highlight other reports suggesting the Petitioner suffered from various

personality disorders, reports that showed no signs or symptoms of psychosis, or reports suggesting prior neurological examinations were within normal limits. Counsel also explained that even if they found a mental health expert who could affirmatively testify about the Petitioner's brain damage, the jury might view the expert's opinion as having been "bought and paid for," especially in light of the fact that there were contradictory reports the State could highlight on cross-examination. Counsel further explained that presenting evidence, such as evidence elicited during the post-conviction hearing that the Petitioner could not control his impulses because of his brain damage and his brain damage would not prevent him from attempting escape in the future, would contradict their theory that the Petitioner had become well-adjusted in prison, was viewed as a model inmate, and did not pose any future danger in prison.

The Petitioner argues that trial counsel "offer[ed] fallacious circular reasoning" regarding their decision to call Dr. Angelillo as a witness. According to the Petitioner, if counsel wanted to avoid arming the State with the ammunition of a personality disorder, they should have never requested that Dr. Angelillo perform psychological testing or questioned him during trial about his diagnosis of a personality disorder. As the State observes in its brief on appeal, though, counsel intended to limit Dr. Angelillo's testimony by "hit[ing] the high points" and not "drag[ging] out mental health in front of the Jury." Although Dr. Angelillo could not render a specific diagnosis, he would testify that evidence of a personality disorder was the product of the Petitioner's upbringing and environment. Counsel intended for Dr. Angelillo to explain to the jury that the system had failed the Petitioner because he never received sufficient mental health treatment. Indeed, Dr. Angelillo opined that "the lack of sufficient mental health treatment afforded the Defendant as a child, the rejection he had experienced, and the physical and sexual abuse he had undergone all had a profound effect on his development." *Odom*, 336 S.W.3d at 553. Dr. Angelillo also testified that the Petitioner had a history of brain damage. Contrary to the Petitioner's argument, Dr. Angelillo's testimony fit squarely within counsel's theory "that the [Petitioner's] time in the structured environment of Riverbend had 'behaviorally defined . . . his ability . . . to engage in constructive activities.' [Dr. Angelillo] believed that the [Petitioner] would continue to thrive in this structured environment if given a life sentence." *Id.*

The Petitioner focuses part of his argument on this issue on the fact that counsel did not retain the services of Dr. Angelillo until approximately two months before trial. As explained above, however, counsel had thoroughly investigated the Petitioner's background and had decided by that time to pursue a different theory of mitigation. According to counsel, Dr. Angelillo was hired to see if counsel missed anything obvious, and he ultimately helped to explain to the jury how the lack of treatment and abuse the Petitioner experienced affected his development. Lead sentencing counsel testified, "I don't think we would have put him on at all if we hadn't thought that, if it didn't move with our theme." As the post-conviction court concluded, counsel reviewed all relevant records, discussed a possible mental health defense, considered results from previous

hearings, and decided, based upon the Petitioner's station in life at the time of the second resentencing hearing, that their best defense was to generate empathy through family testimony and demonstrate that the Petitioner would not pose any future danger because he would never be released from prison, even with a life sentence. Counsel were able to convince family members to testify on the Petitioner's behalf even though they had refused to get involved in prior hearings. Through family members and other lay witnesses, counsel were able to paint a picture about the Petitioner's awful childhood and adolescence and were able to describe the horrific conditions the Petitioner experienced in the various institutions where he spent time in Mississippi. Indeed, Ms. Shettles recounted to the jury the information she obtained through her extensive investigation, one which she said was the most thorough of any of the ninety or so capital cases on which she worked. Counsel said that the testimony by the Petitioner's family members was "incredible" and that no "mental health expert ever could have gotten the emotion that [they] were able to get out of" the lay witnesses.

We agree with the following assessment by the post-conviction court:

Based upon the testimony of [sentencing co-counsel, lead sentencing counsel], and Shettles, this court finds 2007 trial counsels' decision not to pursue a neurological evaluation of petitioner or a mitigation theory based upon cognitive impairment was made after extensive investigation into petitioner's background and social history and considerable discussions about the viability of various strategies. In particular, Shettles testified about the extensive investigation she performed on petitioner's case. It appears counsel were fully apprised of all the many prior examinations of petitioner and various diagnosis of the different reviewing mental health and medical professionals. Shettles collected numerous documents, contacted various experts, conducted research about possible theories, interviewed witnesses and worked diligently to develop a relationship with petitioner's family to facilitate their participation in petitioner's defense which prior to the 2007 proceeding had been very limited. Due to the fact Shettles worked on petitioner's 1999 resentencing proceeding and his 2007 resentencing proceeding, Shettles [had] several years to investigate and develop mitigation in petitioner's case. As a result, she testified she found the investigation and presentation of mitigation in petitioner's case to be the most [thorough] she had ever prepared or presented. Thus, this court finds trial counsel were not ineffective in pursuing a theory based upon petitioner's terrible past and the failures of the system in addition to an argument indicating petitioner posed little future dangerousness.

In analyzing a claim that counsel provided ineffective assistance during sentencing, we must keep in mind the principles we recited earlier in this opinion, in addition to those summarized by our supreme court in *Davidson*, including "the strong

presumption that counsel provided adequate assistance and used reasonable professional judgment to make all strategic and tactical significant decisions." *Id*. at 393. In order for counsel's strategic and tactical choices to be entitled to deference, they must be "informed ones based upon adequate preparation." *Goad v. State,* 938 S.W.2d 363, 369 (Tenn. 1996). Similarly, the presentation of some mitigating evidence does not "foreclose an inquiry into whether a facially deficient mitigation investigation might have prejudiced the defendant." *Sears v. Upton,* 561 U.S. 945, 955, 130 S. Ct. 3259, 3266 (2010). An inquiry into whether counsel rendered ineffective assistance in the presentation of mitigation requires a "probing and fact-specific analysis" that includes consideration of "the totality of the available mitigation evidence -- both that adduced at trial and the evidence adduced in the [collateral] proceeding." *Id.* at 955-56; 130 S. Ct. at 3266; *see also Wiggins v. Smith,* 539 U.S. at 527.

Based upon our review of the records, we conclude that counsel's performance in the presentation of mitigating evidence during the second resentencing hearing in this case was not deficient. Counsel chose a reasonable strategy during sentencing based upon an extensive investigation and after careful consideration of all the circumstances. Thus, we will not second-guess that decision now. As the case law cited above illustrates, there is no requirement that counsel pursue a particular strategy or theory of mitigation, just as long as counsel's ultimate decision was reached after a thorough investigation into a defendant's background.

Although we have concluded that the Petitioner has not satisfied the first prong of the *Strickland* standard, we will nevertheless discuss whether counsel's failure to present evidence similar to that introduced during post-conviction would have resulted in any prejudice. When considering whether a capital defendant was prejudiced by counsel's failure to present sufficient mitigating evidence, our supreme court has directed the reviewing courts to consider the following: (1) the nature and extent of the mitigating evidence that was available but not presented; (2) whether substantially similar mitigating evidence was presented to the jury in either the guilt or penalty phase of the proceedings; and (3) whether there was such strong evidence of aggravating factors that the mitigating evidence would not have affected the jury's determination. *Goad*, 938 S.W.2d at 371. In the context of capital cases, a defendant's background, character, and mental condition are unquestionably significant. "[E]vidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse." *California v. Brown*, 479 U.S. 538, 545 (1987) (O'Connor, J., concurring). "This evidence often serves to humanize the defendant and reveals aspects of the defendant's life or inner workings that might affect the jury's assessment of the defendant's moral culpability for the crime." *Davidson*, 453 S.W.3d at 395.

The right capital defendants have to present a vast array of personal information in mitigation during the sentencing phase, however, is constitutionally distinct from the question of whether counsel's choice about what information to present to the jury was professionally reasonable. The basic concerns of counsel during a capital sentencing proceeding are to neutralize the aggravating circumstances advanced by the State and to present mitigating evidence on behalf of the defendant. Although there is no requirement to present mitigating evidence, counsel does have the duty to investigate and prepare for both the guilt and the penalty phase. *See Goad*, 938 S.W.2d at 369-70; *Zagorski v. State*, 983 S.W.2d 654, 657 (Tenn. 1998). In determining whether counsel breached this duty, counsel's performance is reviewed "for 'reasonableness under prevailing professional norms,' which includes a context-dependent consideration of the challenged conduct as seen 'from counsel's prospective at the time.'" *Wiggins v. Smith*, 539 U.S. at 523 (quoting *Strickland*, 466 U.S. at 688-89)). Counsel is not required to investigate "every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing." *Id*. at 533. Nor is counsel required to interview every conceivable witness. *See Hendricks v. Calderon*, 70 F.3d 1032, 1040 (9th Cir. 1995). In other words, counsel's duty to investigate and prepare is not limitless. *Id*.

Although the Petitioner presented more detailed evidence of his brain damage in post-conviction, Dr. Brawley could not confirm the Petitioner's neurological damage contributed to his actions at the time of the murder in this case. Dr. Brawley also testified that the Petitioner was stressed about being "locked up for something [he] didn't do." She opined that deficits in the Petitioner's frontal lobe functioning and mental flexibility most probably affected the Petitioner's behavior and personality over his life span and could have significantly impacted his judgment, impulsivity, and decision making. She also opined, however, that the Petitioner's mental state likely had improved over time because he had been confined in a very structured prison environment in Tennessee for many years. Dr. Merikangas also testified that the Petitioner had brain damage, which had probably been present his entire life. According to Dr. Merikangas, that brain damage affected the Petitioner's ability to control his impulses and would not necessarily prevent him from attempting to escape prison in the future. Dr. Merikangas did not say, however, that the Petitioner's brain damage prevented him from knowing right from wrong, and he did not comment on whether the Petitioner's brain damage caused the Petitioner to commit two murders. Dr. Merikangas did opine, like Dr. Angelillo, that the Petitioner functioned better in the prison environment in Tennessee.

Considering the *Goad* factors listed above, we cannot conclude that counsel's failure to present this type of evidence prejudiced the Petitioner. Neither Dr. Brawley nor Dr. Merikangas could specifically state whether the Petitioner's brain damage affected his actions at the time of the murder in this case. Both doctors commented on the Petitioner's inability to control his impulses, something which counsel was keen on keeping from the jury. As Dr. Angelillo testified, both Drs. Brawley and Merikangas testified that the Petitioner's condition had improved while in prison. During the

- 45 -

resentencing hearing, Dr. Angelillo referenced the Petitioner's history of brain damage and explained that the lack of mental health treatment and abuse the Petitioner suffered had a profound effect on his development. As the State aptly notes, counsel were "able to walk a very fine line: present all of the evidence of the Petitioner's limitations they could without also presenting evidence that the Petitioner suffered from a degenerative disease that would make him dangerous in the future." Counsel's theory of mitigation, which we have already concluded was reasonably reached upon a thorough investigation, would have been hampered if mental health experts had testified that the Petitioner lacked the ability to control his actions. Both post-conviction experts confirmed the Petitioner functioned better in prison. Counsel were able to demonstrate that fact to the jury. They were also able to present evidence that it would be almost impossible for the Petitioner ever to be released from prison if given a life sentence. As to the strength of the two aggravating factors, the prior murder and the fact that the instant murder was committed during a robbery attempt, our supreme court observed that they "were firmly established by the evidence." *Odom*, 336 S.W.3d at 572. Given the mitigating evidence presented by counsel during the second resentencing hearing, and in light of the discussion herein, we conclude that the additional post-conviction evidence would not have affected the jury's verdict. The Petitioner is not entitled to relief on this issue.

2. Evidence of Petitioner's Repeated Sexual Assaults

The Petitioner also argues that trial counsel failed to investigate adequately and present sufficient evidence that he suffered repeated sexual assaults. The Petitioner refers to the abuse he suffered at home as a child and adolescent as well as the abuse he suffered in Parchman Prison. The evidence introduced at the 2007 resentencing hearing and the post-conviction evidentiary hearing is summarized above. In his brief, the Petitioner recites much of that testimony. The jury heard from four witnesses about the abuse the Petitioner suffered at the hands of his stepfather, who was described as "a pervert – just a sorry person." The jury also heard from Ms. Shettles and Jimmy, Jr., about the sexual abuse the Petitioner endured as a juvenile in prison in Mississippi. The Petitioner recounts the evidence introduced during the evidentiary hearing and argues that had trial counsel discovered those additional witnesses, counsel would have been able to present a more compelling picture about the abuse he suffered and how it affected his mental and emotional health.

In denying relief on this issue, the post-conviction court noted that counsel did introduce evidence of the Petitioner's abuse during the 2007 resentencing hearing. Trial counsel attempted, albeit unsuccessfully, to preclude opening the door to evidence about the Petitioner's prior escape from prison. Thus, the post-conviction court concluded that counsel made a strategic decision to exclude extensive evidence relating to the Petitioner's time at Parchman. The post-conviction court also noted that the post-conviction testimony by Ms. Chandler referred to an incident when the Petitioner was accused of rape and was identified as a "problem inmate" because it was not the first such

report. As the post-conviction court stated, evidence of that nature would have been damaging to defense counsel's theory that the Petitioner had performed well in prison and did not pose any future danger.

Upon review of the record, we conclude that the Petitioner has failed to establish how counsel's performance was deficient in presenting evidence of his abuse in support of their theory of gaining empathy from the jury. As noted above, the jury was informed that the Petitioner was sexually abused at home and in prison in Mississippi. Counsel had the benefit of Ms. Shettles' extensive investigation, which revealed evidence of abuse. Counsel were also able to convince some of the Petitioner's family members to testify on his behalf, and their testimony referred to the childhood and prison abuse the Petitioner suffered. The Petitioner seems to suggest that the witnesses who testified about the abuse were not qualified or competent. For example, he states that counsel "failed to do a complete investigation and instead presented testimony regarding the sexual victimization at Parchman through [his] brother Jimmy, [Jr.]." He asserts that counsel should have called other inmates besides the Petitioner's adoptive brother to testify about the conditions at Parchman. However, there is no requirement that counsel present cumulative evidence during sentencing. *See Nichols v. State*, 90 S.W.3d 576, 601-02 (Tenn. 2002).

Regardless, considering the *Goad* factors cited above, we find that the evidence introduced during post-conviction was similar in nature to the evidence at the resentencing hearing. Although post-conviction counsel was able to find additional witnesses, "[a] reasonable investigation is not an investigation that the best criminal defense lawyer in the world, blessed not only with unlimited time and resources but also with the benefit of hindsight, would conduct." *Tyrone Chalmers v. State*, No. W2006-00424-CCA-R3-PD, 2008 WL 2521224, at *37 (Tenn. Crim. App. at Jackson, June 25, 2008). Similarly, "[a] reasonable investigation does not require that counsel leave no stone unturned." *Perry Anthony Cribbs v. State*, No. W2006-01381-CCA-R3-PD, 2009 WL 1905454, at *48 (Tenn. Crim. App. at Jackson, July 1, 2009). This is not a case where counsel failed to introduce any, or just cursory, mitigation. Even assuming counsel should have called additional witnesses to testify about the abuse the Petitioner suffered, the strength of the aggravating circumstances weighs against a finding of prejudice. The Petitioner is not entitled to relief on this ground.

3. Jury Selection

The Petitioner argues that counsel were ineffective during jury selection in the second resentencing hearing for failing to ask jurors case-specific questions, failing to "life-qualify" the jurors properly, and failing to object when the State improperly defined "mitigation." The Petitioner also seems to suggest that the State improperly excluded jurors who expressed reservations about the death penalty. The post-conviction court disagreed, stating:

[T]his court finds the jurors were properly life qualified through the questioning of the court, the state and defense counsel. Although defense counsel did not provide an explicit definition of mitigation to the jury, the court and the state provided explanations to the jury regarding the definition, nature and role of mitigation.

Finally, this court does not find trial counsel was ineffective in their attempts to question jurors about their reactions to specific circumstances of the offense. It appears counsel did attempt to question the jurors about their reactions to specific aspects of the offense; however, the trial court ruled they could not question jurors about the exact circumstances of the offense. This court does not find counsel were . . . ineffective in failing to cite to a specific case. Moreover, even if counsel were ineffective in this regard, this court find[s] petitioner has failed to demonstrate he was prejudiced by counsels' inaction.

The Petitioner does not identify the "case-specific" questions counsel should have asked. Regardless, counsel did attempt to question a prospective juror about whether the specific facts of this case would prevent him from following the judge's instructions on the law. The trial judge, however, refused to allow them to embark on that line of questioning. Contrary to the Petitioner's assertion, counsels' performance cannot be deemed deficient in that respect. Moreover, the Petitioner has failed to demonstrate any resulting prejudice. As to his claim that counsel failed to "life-qualify" the jurors adequately, this court has stated that "not questioning as to whether a prospective juror can fairly consider a life sentence does not necessarily constitute deficient performance." *Tyrone Chalmers*, No. W2006-00424-CCA-R3-PD, 2008 WL 2521224, at *27 (citations omitted). The Petitioner acknowledges, however, that counsel did question whether jurors could vote for life if they did not find the aggravation outweighed the mitigation. Accordingly, based upon this court's review of the entire jury selection, during which the trial judge and the parties explained to the jury the concepts of aggravating and mitigating evidence and the weighing process, this court cannot conclude that counsels' performance was deficient in this respect. Furthermore, the Petitioner has failed to establish any prejudice resulting from counsels' failure to object to the State's alleged improper definition of "mitigation." Upon our review of the record, the jury was properly instructed on the law of capital cases in Tennessee. To the extent the Petitioner complains about the actions of the State during jury selection, his challenges must be considered waived in the post-conviction context. *See* Tenn. Code Ann. § 40-30-106(g). The Petitioner is not entitled to relief on these issues raised against defense counsel during the second resentencing hearing.

4. Polling of Jury

- 48 -

The Petitioner also argues that counsel were ineffective for failing to poll the jury following the return of the sentence in 2007. Without any proof or citation to any controlling authority, the Petitioner asserts that "[i]n light of the jury deliberating for more than ten hours over [his] sentence, counsel should have requested that the jury be polled to ensure that the verdict was not coerced." Noting that polling of the jury is discretionary, *see* Tennessee Rule of Criminal Procedure 31(e), the post-conviction court concluded that the "Petitioner presented this court with no proof concerning what, if any, difference polling would have made in the outcome of Petitioner's trial and provided no proof indicating the verdict was anything other than unanimous." Despite waiver of this issue, *see* Tennessee Court of Criminal Appeals Rule 10(b), the trial court did affirm that all twelve jurors signed the verdict form. *See* Tenn. Code Ann. § 39-13-204(g). The Petitioner has shown neither deficiency nor prejudice with respect to counsels' performance. Therefore, he is not entitled to relief on this claim.

5. Jury Instructions

The Petitioner contends that counsel were ineffective during the 2007 resentencing hearing for failing to object to the trial court's instruction to the jury on reasonable doubt. This issue has been previously determined. Tenn. Code Ann. § 40-30-106(h). During its review of the death sentence imposed by the jury in 2007, our supreme court affirmed this court's ruling that the instruction at issue did not result in a violation of the Petitioner's due process rights. *Odom*, 336 S.W.3d at 570 n.12. Accordingly, the Petitioner is not entitled to relief on this issue. The Petitioner's challenge to 1992 counsels' failure to object to a similar instruction also must fail.

The Petitioner also contends that counsel should have objected to the instruction that the jury must be unanimous in its decision to render a life sentence. However, this issue also has been previously determined, *State v. Richard Odom*, No. W2008-02464-CCA-R3-DD, 2010 WL 10094693, at *35 (Tenn. Crim. App. at Jackson, Mar. 4, 2010), *aff'd*, *Odom*, 336 S.W.3d at 577, and the instruction at issue has been approved by our supreme court, *State v. Ivy*, 188 S.W.3d 132, 163 (Tenn. 2006). Accordingly, counsel cannot be deemed ineffective for failing to object.

6. Closing Argument

The Petitioner argues that counsel were ineffective during closing arguments during the second resentencing hearing by stating that the crime scene photos were "the worst of the worst." According to his argument, counsel's comments were, in essence, a stipulation that the State had proven its case for the death penalty. The post-conviction court disagreed, saying as follows:

> This court finds, although perhaps poorly worded, the statements of trial counsel did not rendered [sic] their representation deficient. When

considered in the context of the entire closing argument, it is clear defense counsel was simply attempting to acknowledge the photographs of the victim's murder were difficult for the jury to view. Counsel was suggesting the jury must hold the [State to its] burden of proving the aggravating factors; should consider the mitigation presented by the defense; and, should not make a decision based merely on the emotion elicited from having viewed those photographs.

We agree with the post-conviction court. The prosecutor repeatedly referred to the crime scene photos during her closing remarks:

> The death penalty – this process that you have sat through all week is reserved for the worst of the worst. The worst of the worst.

> And the State of Tennessee does not take this lightly. The State of Tennessee does not ask you to just ignore and put your blinders on to everything that you've heard.

> It is difficult to sit and listen to what you had to listen to. It's difficult to look at these pictures.

> And we don't ask you to do it just because. We ask you to do it because the law demands it.

> . . . .

> No. You may never forget this.

> I will submit to you, you will never block out some of the images that you had forced upon you this week.

> . . . .

> If this were a matter of the two aggravators exist [sic], the State's proven them and that's it, you would never get to know about the case. You would never see the pictures of [the victim's] body, her frail, dead, naked body in the back of her car.

> . . . .

> If it was just as easy as us telling a computer he's been convicted of murder before and this murder was during a robbery, we wouldn't need jurors. We wouldn't need you ladies and gentlemen to take a week out of

your life and look at pictures that you'll never forget and listen to words that make you sick, if it were just that easy.

In rebuttal, defense counsel attempted to defuse the State's emphasis on the photographs and to dispute the fact that this case was "the worst of the worst." Counsel's argument, the one the Petitioner now complains about being a concession that the death penalty was warranted in this case, was, in pertinent part, as follows:

> [The judge] read you a jury instruction and part of it – you're going to have these instructions. When he's done talking about the aggravating circumstances, it has this line, read this line. You shall not consider any other facts or circumstances as an aggravating circumstance in deciding whether the death penalty would be appropriate punishment in this case.

> So when they put pictures up on the board of [the victim], what does that law say? Don't consider that for death.

> And that is under the theory of them proving their case to you. After we sat up here and told you we're not contesting the fact that he was convicted.

> Do you know why? Because if you're not mad as hell at [the Petitioner], you're not going to give him the death penalty.

> And when you put pictures of a seventy-eight year old woman who's been raped in the back of a car up there, it makes you mad as hell. It should.

> And they do that to inflame you, knowing it is not an aggravator and cannot be considered by you.

> But they know you are not able to put that out of our [sic] mind. But we talked about sympathy and prejudice before we started this journey. You have to do it.

> The worst of the worst. Show me a murder that's not bad. All crime scene pictures are bad.

> They're seeking the death penalty because the law says they have the right to seek it. They don't have to seek it against anybody. It's their choice. It's why we're here.

> If they didn't seek it, he gets life.

- 51 -

But those pictures are terrible.  The worst of the worst.  It's so bad – nobody's saying [the victim] wasn't a great woman.  I'm sure she was.  She lived seventy-eight years.  It's too bad she couldn't have lived more.

Would it have been better if it had been a twenty-four year old mother of three?  Would it have been better if it had been a child?  No.

Is it any worse than somebody getting gunned down in a liquor store?  No.  It's not.  They're all bad.

It's hard to limit yourself to just those aggravators.

I want to talk about the witnesses a little bit.  John Sullivan was the first witness to come up here.  Nice man.  A good man.  No doubt about that.

But there's a trick in trying to make you mad as hell.  What purpose was there in showing pictures of [the victim] to that man?

They could have easily been introduced by the police officer, the next witness.  Why introduce them through John Sullivan?

Because it's going to make you forget the burden, it's going to make you mad as hell that that seventy-five year old man had to sit up here and look at those pictures when he didn't have to.

Because they don't want you to use the law.  They want you to use passion and anger and you can't.

There was absolutely no reason to make that man look at those pictures.

The next witness, Miss Locastro identified them, too.  There was absolutely no reason not to put them in through her.

Keep in mind, these facts that they proved to you were never disputed.  They could have put on his statement.

But by showing you the horrible pictures and they are horrible, my God, they're horrible, [the prosecutor] said, look at them when you're in the back.  Why?  It's not an aggravator.  It has nothing to do with your aggravator at all.  Look at them, look at them, look at them, look at them.

Because they've got to get you mad as hell to kill [the Petitioner]. That's why.

When read in context, this court does not find that, as the Petitioner now claims, defense counsel's remarks were an "admission that [the Petitioner's] actions warranted the death penalty." Accordingly, counsel's performance cannot be deemed to have been deficient in this respect. The Petitioner is not entitled to relief on this claim.

7. Prosecutorial Misconduct

The Petitioner contends that counsel were ineffective for failing to object to a statement made by the prosecutor during closing arguments in 2007 that the Petitioner anally raped the victim when no evidence was introduced to support that statement. The post-conviction court noted that defense counsel were not questioned during the evidentiary hearing about their decision in this regard. Nevertheless, the court held that the Petitioner otherwise failed to demonstrate prejudice because "[t]he trial court properly instructed the jury statements, arguments, and remarks of counsel are not evidence and informed the jury if any statements were made they believe are not supported by the evidence, they should disregard them."

The statement at issue by the prosecutor was a single, isolated remark. The propriety of this statement was raised on direct appeal as "an ancillary argument" to an issue regarding the admission of the crime scene photographs during the second resentencing hearing. *Richard Odom*, No. W2008-02464-CCA-R3-DD, 2010 WL 10094693, at *20. Despite the fact that there was no contemporaneous objection by defense counsel, this court concluded that some of the prosecutor's remarks during closing argument, including the statement that the Petitioner anally raped the victim, were not an improper attempt to urge the jury to weigh nonstatutory aggravating circumstances. *Id.* at *22. Our supreme court affirmed this court's holding. Although it did not specifically reference the statement at issue in its opinion, as this court did, the court held that "even if the argument on behalf of the State at any point crossed the line of impermissibility, . . . the trial court properly instructed the jury as to the weighing of the aggravating and mitigating circumstances; it must be presumed that a jury has followed the instructions given by the court." *Odom*, 336 S.W.3d at 562.

Thus, even though this issue could be considered previously determined for post-conviction purposes, in the context of an ineffective assistance of counsel claim, we conclude that the Petitioner is not entitled to relief. As the post-conviction court observed, defense counsel were not questioned about why they did not object to the statement. "The decisions of a trial attorney as to whether to object to opposing counsel's arguments are often primarily tactical decisions." *Derek T. Payne v. State,* No. W2008-02784-CCA-R3-PC, 2010 WL 161493, at *15 (Tenn. Crim. App. at Jackson, Jan. 15,

2010). Trial counsel could have decided not to object for several valid reasons, including not wanting to emphasize the unfavorable statements. *Id.* (citing *Gregory Paul Lance v. State,* No. M2005-01675-CCA-R3-PC, 2006 WL 2380619, at *6 (Tenn. Crim. App. at Nashville, Aug. 16, 2006)). Accordingly, trial counsel must be given the opportunity to explain why they did not object to the allegedly prejudicial remarks. "Without testimony from trial counsel or some evidence indicating that [their] decision was not a tactical one, we cannot determine that trial counsel provided anything other than effective assistance of counsel." *State v. Leroy Sexton,* No. M2004-03076-CCA-R3-CD, 2007 WL 92352, at *5 (Tenn. Crim. App. at Nashville, Jan. 12, 2007). The Petitioner has not demonstrated how trial counsel's failure to object to the prosecutor's remarks was anything other than a tactical decision. Again, counsel were not asked why they did not object to this particular statement. Moreover, the jury was properly instructed on its duty under the law. Accordingly, we conclude that trial counsel were not ineffective in this regard.

The Petitioner also argues that counsel were ineffective for failing to object when the prosecutor defined "mitigation" as follows: "mitigation means to make something less serious, to take away from the severity of it;" "What is the mitigation? What makes this less serious?" The preceding analysis applies equally to the Petitioner's argument regarding these statements. Accordingly, he is not entitled to relief. To the extent he challenges the actions of the prosecutor in making these statements, the issue must be considered waived for post-conviction purposes. *See* Tenn. Code Ann. § 40-30-106(g).

8. Evidence of Prior Violent Crime

The Petitioner argues that counsel were ineffective during the resentencing hearing in 2007 by failing to object to the State's reliance on his previous conviction for first degree murder. According to the Petitioner, because he was a juvenile when he committed that crime, counsel should have moved to remove that prior conviction from the jury's consideration on cruel and unusual punishment grounds. Counsel did, in fact, prepare a pretrial motion to strike the Petitioner's previous murder conviction as an enhancement factor. Relying upon the same authority as the Petitioner does now, *Roper v. Simmons*, 543 U.S. 551 (2005), and *Thompson v. Oklahoma*, 487 U.S. 815 (1988), the motion advanced almost the identical argument the Petitioner now presents on appeal. Counsel, however, chose not to file the motion. Counsel decided not to contest the prior murder conviction because they believed it could benefit their argument to the jury that the Petitioner would never be released from prison if given a life sentence in this case. Counsel testified that "if we had thought that we could wave a magic wand and that [the prior murder conviction] wasn't coming in, we would have done that, too. But – but we did not think that could be avoided and thus, we had to embrace it."

The Petitioner now claims that counsel's proffered strategy "defies logic and sound judgment." As discussed above, though, we conclude that counsel chose a reasonable strategy during sentencing based upon an extensive investigation and after

careful consideration of all the circumstances.

> "Hindsight can always be utilized by those not in the fray so as to cast doubt on trial tactics a lawyer has used. Trial counsel's strategy will vary even among the most skilled lawyers. When that judgment exercised turns out to be wrong or even poorly advised, this fact alone cannot support a belated claim of ineffective counsel."

*Hellard*, 629 S.W.2d at 9 (quoting *Robinson*, 448 F.2d at 1256). "It cannot be said that incompetent representation has occurred merely because other lawyers, judging from hindsight, could have made a better choice of tactics." *Id.* This court must defer to counsel's trial strategy and tactical choices when they are informed ones based upon adequate preparation. *Id.* As noted earlier, criminal defendants are not entitled to perfect representation, only constitutionally adequate representation. *Denton*, 945 S.W.2d at 796. "Thus, the fact that a particular strategy or tactic failed or even hurt the defense does not, alone, support a claim of ineffective assistance." *Cooper*, 847 S.W.2d at 528.

The Petitioner is engaging in the sort of hindsight analysis this court must avoid. Counsel gave an objectively reasonable explanation for not pursuing the motion to strike the Petitioner's previous murder conviction from the jury's consideration. Contrary to the Petitioner's assessment, their performance in that respect cannot be considered deficient.

In *Thompson*, the United States Supreme Court held that the Eight Amendment precludes the execution of a defendant convicted of first degree murder for an offense committed when the defendant was under sixteen years old. 487 U.S. at 838. In *Roper*, the court raised the prohibitive age at the time of the offense to under eighteen years old. 543 U.S. at 574. In *State v. Davis*, the Tennessee Supreme Court was presented with the same issue raised by the Petitioner herein. 141 S.W.3d 600 (Tenn. 2004). In that case, the defendant argued that his prior conviction of first degree murder should not be used to support the prior violent felony aggravating circumstance because he was a juvenile when he committed that offense. *Id.* at 616. The defendant argued that, because he would not have been eligible for the death penalty for the prior murder conviction, it should not be used to impose the death penalty for a later offense. *Id.* Our supreme court disagreed. Recognizing the distinction with the imposition of the death penalty for a juvenile offender, the court held that "there was no constitutional or statutory restriction against the use of [the defendant's] prior conviction for first degree murder" committed while the defendant was a juvenile to support the prior violent felony aggravating circumstance. *Id.* at 618. In reaching its conclusion, the court reasoned,

> *As a constitutionally necessary first step under the Eighth Amendment*, the Supreme Court has required the states to narrow the sentencers' consideration of the death penalty to a smaller, more culpable class of

- 55 -

homicide defendants. . . . A proper narrowing device . . . provides a principled way to distinguish the case in which the death penalty was imposed from the many cases in which it was not . . . , and must differentiate a death penalty case in an objective, even-handed, and substantially rational way from the many murder cases in which the death penalty may not be imposed. . . . As a result, a proper narrowing device insures that, even though some defendants who fall within the restricted class of death-eligible defendants manage to avoid the death penalty, those who receive it will be among the worst murderers—those whose crimes are particularly serious, or for which the death penalty is peculiarly appropriate.

*Id.* at 617 (emphasis added; omissions in original). Our supreme court later held the same in *State v. Cole*. 155 S.W.3d 885, 905 (Tenn. 2005) (rejecting argument that death penalty was arbitrarily imposed based upon prior violent felony committed while a juvenile). Addressing Cole's challenge on post-conviction that the Eighth Amendment prohibited use of his juvenile conviction in support of the prior violent felony aggravator, this court concluded that the issue had been previously determined on direct appeal. *Detrick Cole v. State*, No. W2008-02681-CCA-R3-PD, 2011 WL 1090152, at *52 (Tenn. Crim. App. at Jackson, Mar. 8, 2011).

Thus, contrary to the Petitioner's assertion, even if counsel had decided to file the motion to strike consideration of the Petitioner's juvenile conviction, the case law cited above demonstrates that it would have been denied. Accordingly, the Petitioner is unable to establish any resulting prejudice from counsel's decision. The Petitioner is not entitled to relief on this claim.

9. Residual Doubt Defense

The Petitioner argues that his attorneys at the second resentencing hearing failed to investigate adequately his guilt to determine whether a residual doubt defense was viable. While recognizing that the ability of the Petitioner to present evidence at a resentencing hearing, which may mitigate his culpability of the crime, *see State v. McKinney*, 74 S.W.3d 291 (Tenn. 2002), the post-conviction court concluded that the Petitioner failed to establish deficiency on the part of counsel for failing to pursue such a defense in mitigation:

In petitioner's case, it appears 2007 counsel chose not to present a defense based upon residual doubt due to the unsuccessful attempts at litigating guilt in petitioner's prior proceedings. [Lead sentencing counsel] testified the focus of the defense team at the 2007 resentencing trial was not guilt or innocence but rather mitigation based upon petitioner's background and record while incarcerated to demonstrate a lack of future dangerousness. He stated had there been some issue of importance relating

to guilt or innocence which impact[ed] potential mitigation [then] the team would have investigated such issues. However, he did not recall any such concerns in petitioner's case. [Lead sentencing counsel] testified he is familiar with the concept of residual doubt as a mitigation theory and stated the defense team had access to guilt phase investigators and would have developed such a theory if they felt information warranted this theory.

[Lead sentencing counsel] identified an extensive letter sent to him by petitioner indicating petitioner did not wish to pursue a mental health theory as mitigation but wanted instead to raise a mitigation theory of residual doubt. However, after discussions with petitioner and [sentencing co-counsel], [lead sentencing counsel] stated he was able to convince petitioner a theory of limited future dangerousness and a presentation of his social history was a more appropriate mitigation strategy. Attorney [sentencing co-counsel] also testified he evaluated petitioner's case and, although petitioner maintained his innocence, he concluded a strategy based upon residual doubt was not the strongest proof available to the defense. Rather, he stated the defense team attempted to portray petitioner as a broken individual who had been failed by the system but, who once incarcerated, had thrived and posed limited future dangerousness [if] given a sentence less than death. To this end, counsel presented testimony from petitioner's family members describing petitioner's difficult childhood, presented testimony from petitioner's brother about petitioner's incarceration at Parchman Prison, and presented testimony from Glori Shettles regarding petitioner's record while incarcerated.

This court finds petitioner has failed to demonstrate trial counsel's tactical decisions in this regard were the result of insufficient investigation or deficient representation. Petitioner presented no proof indicating a mitigation defense based upon residual doubt would have been more advantageous to petitioner than the strategy employed by trial counsel. Despite maintaining his innocence, petitioner confessed to the crime and physical evidence placed him at the scene. Thus, this court finds little value would have been added to petitioner's 2007 mitigation defense by including an argument based upon residual doubt or by abandoning other mitigation in favor of solely focusing on residual doubt as a mitigation theory.

On appeal, the main substance of the Petitioner's entire argument in support of his contention that counsel should have pursued a residual doubt defense is as follows:

Residual doubt presents a unique opportunity as a mitigating circumstance during a capital resentencing proceeding. Indeed, [the

Petitioner's] 2007 [lead sentencing counsel] noted the advantages to presenting residual doubt as a mitigating circumstance during a resentencing hearing as opposed to presenting such evidence as a mitigating circumstance at the initial sentencing proceeding: "we're in a better position than you usually are, because, usually, you spend all, you know, four or five days saying, 'We didn't do it,' and then, right after that, you have to go beg for someone's life, right after you spit on them for four days."

Moreover, multiple comprehensive surveys have found that lingering or residual doubt is by far the strongest mitigating factor for capital jurors. Following [lead sentencing counsel's] reasoning above, the jury in [the Petitioner's] 2007 resentencing proceeding would have been even more receptive to considering residual doubt as a mitigating factor as they had not been tainted by a guilt proceeding. [The Petitioner's] counsel were thus ineffective for failing to present persuasive evidence of residual doubt to his 2007 resentencing jury and he was prejudiced as a result. [Internal citation to record and footnote citing law review articles omitted].

The Petitioner offers absolutely no evidence that counsel should have presented in support of a residual doubt defense during resentencing. Upon our independent review, we fully adopt the post-conviction court's findings and conclusion on this issue. The Petitioner has failed to demonstrate how counsel's decision not to pursue a residual doubt defense in mitigation was deficient. He is not entitled to relief on this claim.

## B. 1992 Trial Errors

### 1. *Brady* Violation

The Petitioner argues that the State's failure to disclose evidence favorable to his defense denied him due process in violation of the principles announced in *Brady v. Maryland*. The evidence cited by the Petitioner includes the identity of other alleged suspects and untested and undisclosed physical evidence recovered from the crime scene. The State asserts that the Petitioner has waived this issue by failing to raise it on direct appeal or during the subsequent resentencing hearings. The Petitioner does not explain in his reply brief how waiver does not bar consideration of this issue on post-conviction other than to state generally that counsel were ineffective for failing to raise it. Although the State asserted waiver in the post-conviction court, the post-conviction court did not comment on whether the issue had been waived but instead examined the merits of the Petitioner's *Brady* claim.

"A ground for relief is waived if the petitioner personally or through an attorney failed to present it for determination in any proceeding before a court of competent

jurisdiction in which the ground could have been presented unless . . . [t]he failure to present the ground was the result of state action in violation of the federal or state constitution." Tenn. Code Ann. § 40-30-106(g). Waiver notwithstanding, because the Petitioner insinuates that his attorneys were ineffective for failing to raise the *Brady* issue, we will review the post-conviction court's ruling on the merits of the issue.

The post-conviction court stated as follows:

Petitioner asserts, in August 1991, trial counsel filed a Motion for Production of Police Reports and specifically requested the *Brady* material at issue. He further asserts the State suppressed the information erroneously arguing the police reports contained statements of witnesses and were therefore excepted from pre-trial discovery by the Jencks Act and Tenn. Rule Crim. P. 26.2. Petitioner argues the police files were clearly discoverable. Petitioner alleges the Memphis Police investigative file contains the primary incident report, twelve typed supplemental reports, nine handwritten supplemental reports, extensive evidence logs, and crime scene diagrams. He alleges only seven of the nearly two-hundred pages were ever provided to defense counsel and none of those pages concerned the potential exculpatory evidence relating to the identity of other suspects or untested physical evidence recovered from the crime scene.

Petitioner contends the reports [identified] numerous other suspects, including the following:

1. Four different witnesses who reported seeing a man in a green work uniform around the crime location at the time of the murder. Petitioner alleges one witness indicated the individual was "acting real strange," and two others reported seeing the individual on the ninth [sic] floor of the building, just above the crime scene on the same floor were a "possible blood smear" was photographed by members of the Memphis Police Department;

2. A possible "violent and erratic young man" whom a local firefighter living in the apartment building adjacent to the crime scene had complained about to the Memphis Police Department. Petitioner asserts the firefighter told police the man "acts funny and has just gotten out of jail for murder" and had recently assaulted a couple at a nearby apartment building;

3.  Lee Thomas Brown whom witnesses described as a "trouble maker" with a "slight mental problem and . . . a considerable temper" and who slept in the garage where the murder occurred.  Petitioner asserts police located Brown and he as [sic] was wearing a paper hospital gown which he reportedly was given after his emergency commitment to a local hospital on the day preceding the murder.  When questioned Brown informed police, at the time of the murder, he was down at Court Square feeding the squirrels;

4.  A "bandana wearing street person" who two different witnesses observed seeing in front of the crime scene shortly before the murder.  Petitioner alleges one witness described the individual as a neighborhood regular with a drug problem;

5.  Kenneth Patterson, a suspect with a history of aggravated rape.  Petitioner asserts approximately thirty-six hours after the murder, Patterson was shot and killed by a Memphis police officer responding to a domestic disturbance call.

In addition to the evidence relating to other suspects, petitioner also alleges the undisclosed police reports documented the following potentially exculpatory items of physical evidence recovered from the crime scene which were never disclosed to defense counsel:

1.  White hairs clutched in the hand of the victim.  Petitioner asserts these hairs are presumably from the perpetrator and therefore highly probative of his actual innocence;

2.  A blood smear taken from the 19th floor of the building were [sic] the murders occurred.  Petitioner alleges the primary occupant of the 19th floor was a criminal defense attorney who regularly saw approximately twenty clients a day, including the man in the green uniform identified by witnesses as "acting strangely."  (see above).  Petitioner asserts the presence of blood on the 19th floor suggests the assailant may have gone upstairs rather than down into the alley as the State argued at trial;

3.  Scrapings taken from blood spots located on the ceiling above the victim's car which were never analyzed by the police.  Petitioner alleges the mere presence of such scrapings

contradicts the State's theory the stabbing occurred fully inside the vehicle;

4.      Fingerprints collected during the course of the investigation other than those matching petitioner.

In order to establish a due process violation based upon an allegation the State failed to disclose exculpatory evidence, the petitioner must first demonstrate the evidence was indeed suppressed. *See Johnson*, 38 S.W. 3d 52. This court finds petitioner has failed to meet his burden. At the post conviction hearing, [trial co-counsel] testified Jerry Harris was the lead prosecutor representing the State's interest in petitioner's case. She did not specifically remember discovery in petitioner's case. However, she stated Harris' normal practice would be to make the entire State file available to defense counsel, allow defense counsel to review the file and make notes, and to copy the items the defense was entitled to receive in discovery.

At a pretrial hearing related to petitioner's 1999 trial, Harris stated he was making the entirety of the state's file available to 1999 counsel. Although having no specific recollection of the discovery in this case, [trial co-counsel] stated such a statement was consistent with her prior dealings with prosecutor Harris. The 1999 record also indicated Harris informed the court he had met with defense counsel on several occasions and provided open file discovery. Again, [trial co-counsel] testified this practice was consistent with her dealings with prosecutor Harris. In April 1999, Harris again informed the court he met with defense counsel and provided open file discovery and made copies for counsel of all material requested by counsel and defense counsel agreed open file discovery had been provided. Once again, [trial co-counsel] testified this experience was consistent with her experience with Harris and indicated she believed this was likely the method of discovery employed in the 1992 trial.

[Trial co-counsel] was asked about a statement in the record relating to the 1992 trial made on September 11, 1992, in which [lead trial counsel] stated in response to questions about the defense motion for discovery, "we have been provided everything the state has." In another passage from the same hearing [lead trial counsel] responds, "yes" when asked by the court if he has received discovery and Harris states, "I know of no evidence we have that is exculpatory in nature. [Trial co-counsel] has been over my file and if there is any in there she's got it. She read my file and there is not any information in my files she has not read or has not been made available for her." In response to the court's questioning, [trial co-counsel] agreed she received discovery and stated, "Mr. Harris has been very generous in

allowing us to review his file." [Trial co-counsel] stated she had no specific recollection of making these statements but stated if the record reflects she did so, then the statements she made were true and accurate and further indicated such statements reflected her general recollection of her dealings with prosecutor Harris. Finally, [trial co-counsel] did not recall if, at the end of the hearing, Harris offered [trial co-counsel] and [lead trial counsel] come back to his office one final time to again review the discovery. However, she stated if the offer were made, she would have likely again reviewed the file with [lead trial counsel] and Harris.

In *Brady v. Maryland*, the United States Supreme Court held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. 83, 87 (1963). The State's duty to disclose extends to all favorable information irrespective of whether the evidence is admissible at trial. *Id.* This duty, however, does not extend to information the defendant already possesses, or is able to obtain, or to information not in the possession of the prosecution or another governmental agency. *State v. Marshall*, 845 S.W.2d 228, 233 (Tenn. Crim. App. 1992). *Brady*, however, applies not only to evidence in the prosecution's file but also to "any favorable evidence known to others acting on the government's behalf in the case, including the police." *State v. Jackson*, 444 S.W.3d 554, 594 (Tenn. 2014) (citations omitted). In order to sustain a *Brady* claim, a defendant must establish the following:

1. The defendant must have requested the information (unless the evidence is obviously exculpatory, in which case the State is bound to release the information, whether requested or not);

2. The State must have suppressed the information;

3. The information must have been favorable to the accused; and

4. The information must have been material.

*State v. Edgin,* 902 S.W.2d 387, 389 (Tenn. 1995).

"Favorable" evidence is that which is deemed to be exculpatory in nature or that which could be used to impeach the State's witnesses. *Johnson v. State*, 38 S.W.3d 52, 55-56 (Tenn. 2001). "'[E]vidence which provides some significant aid to the defendant's case, whether it furnishes corroboration of the defendant's story, calls into question a material, although not indispensable, element of the prosecution's version of the events, or challenges the credibility of a key prosecution witness'" falls within the *Brady* disclosure requirement. *Jackson*, 444 S.W.3d at 593 (quoting *Johnson*, 38 S.W.3d at 56-

57). Evidence is deemed material if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985).

> [The] touchstone of materiality is a "reasonable probability" of a different result, and the adjective is important. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A "reasonable probability" of a different result is accordingly shown when the government's evidentiary suppression "undermines confidence in the outcome of the trial."

*Kyles v. Whitley*, 514 U.S. 419, 434 (1995) (quoting *Bagley*, 473 U.S. at 678). Materiality requires a "showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Id.* at 435. In deciding whether the evidence is material, the suppressed evidence must be "considered collectively, not item by item." *Id.* at 436.

Based upon our review of the record, we conclude that the evidence does not preponderate against the post-conviction court's finding that the State did not suppress the evidence at issue. Trial co-counsel testified that the prosecutor maintained an open-file policy and, thus, permitted defense counsel to view everything the prosecution possessed. During a pretrial hearing in 1992, the trial court granted the Petitioner's request for discovery, including any exculpatory evidence, but denied his request for statements of the State's witnesses. The prosecution stated, however, and trial co-counsel agreed, that the defense was given access to view the State's entire file. The Petitioner relies on a statement by the prosecutor that "police reports that are statements of witnesses or contain statements of witnesses, possibly, are discoverable after the witness testifies." However, the trial court ruled in accordance with Tennessee Rule of Criminal Procedure 26.2 that the prosecution was required to produce a witness' statement for examination and use only after the witness testified.

According to the State, the Petitioner has failed to demonstrate that trial co-counsel did not review the police reports during discovery, especially when the prosecutor repeatedly stated that defense counsel had reviewed their entire file. We agree. The Petitioner seems to suggest that the State violated *Brady* by not providing them with copies of the witness statements. As trial co-counsel testified during post-conviction, though, the prosecutor would say to defense counsel, "Here is the prosecutor's file. You may read it. Don't copy anything you're not supposed to have." This would include copying any witness statements. The Petitioner's statement in his brief on appeal that "[t]he record establishes that the district attorney file reviewed by defense counsel did not include the police reports and exculpatory material" is

unfounded. The parties stipulated during the evidentiary hearing that the police reports were included in the prosecutor's trial file, and the State argued in its post-hearing brief, without any rebuttal from the Petitioner, that the police reports were in the prosecution's file, which defense counsel was permitted to review in its entirety. Although the Petitioner asserts on appeal that defense counsel were provided with only seven pages of the 194-page police report, he fails to cite to the record in support of his assertion.

Moreover, the Petitioner has failed to demonstrate how the list of the other alleged suspects would have been favorable to his defense. Indeed, as trial co-counsel testified during the evidentiary hearing, defense counsel would not have conducted an investigation into those individuals, especially if the police did not look into them any further. As she stated, "[W]e would have considered suspects to follow up on those persons that the police thought of as suspects, not just people they generically mentioned." Nor has he demonstrated how any of the physical evidence listed above would have been favorable. Although the hairs were produced during post-conviction, the Petitioner apparently chose not to have them tested. As to the evidence of blood on a floor in the parking garage above where the crime occurred, the Petitioner merely speculates that it could have led to another suspect. Additionally, as the State argues, evidence of blood spots on the ceiling above the victim's car was not necessarily inconsistent with the Petitioner's own statement that he did not remember where at the scene he stabbed the victim. Regardless, trial co-counsel testified that she did not even seek to have the Petitioner's bloody clothes tested because she did not think it would help the defense. With regard to the other fingerprint evidence, the Petitioner does not explain how testing of that evidence would have been favorable to his defense when his own fingerprint was found inside the victim's car.

Finally, the Petitioner has failed to establish materiality. Instead, he merely contends that "the Court must put itself in the shoes of the jurors, not simply rely on its own judgment." Materiality, however, requires a "showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles*, 514 U.S. at 435. The evidence of the Petitioner's guilt, which included his own confession to the murder, was overwhelming. Accordingly, he is not entitled to relief on his *Brady* claim.

2. Prosecutorial Misconduct

The Petitioner argues that the State improperly stated during voir dire at the original trial that the mitigating evidence would have to outweigh the aggravating circumstances in order for the jury to return a life sentence. He also alleges prosecutorial misconduct during opening and closing arguments in the guilt phase of his original trial. According to the Petitioner, the prosecution made misleading, inflammatory, and improper statements which requires reversal of his conviction.

The Petitioner has waived this issue as it relates directly to claims of prosecutorial misconduct. *See* Tenn. Code Ann. § 40-30-106(g). As the State observes, the Petitioner did not present these specific challenges on direct appeal even though he had the opportunity to do so. In an apparent attempt to avoid waiver, the Petitioner also argues in his brief on appeal that trial counsel were ineffective for failing to object to this alleged prosecutorial misconduct. As the State also observes, however, the Petitioner did not include this particular claim of ineffective assistance of counsel in his grounds for relief in his original or amended petitions. Therefore, the post-conviction court did not have the opportunity to address it. Accordingly, as couched in terms of an ineffective assistance of counsel claim, the issue must also be considered waived. *Walsh v. State*, 166 S.W.3d 641, 645 (Tenn. 2005) (citing Tenn. Code Ann. § 40-30-110(f)); *see also Travis A. Bledsoe*, No. W2009-01486-CCA-R3-PC, 2010 WL 1980184, at *2 (Tenn. Crim. App. at Jackson, May 18, 2010) (discussing waiver of issue for failing to present to trial court, raising issue for first time on appeal, and changing theory of issue between trial and appellate courts). As to the underlying claims of prosecutorial misconduct, however, the post-conviction court held that the jury was properly instructed on the burden of proof required for the return of a sentence of death and that statements of counsel during argument are not to be considered evidence.

The Petitioner did not question trial co-counsel about counsels' actions during the original trial. As we noted above, "The decisions of a trial attorney as to whether to object to opposing counsel's arguments are often primarily tactical decisions." *Derek T. Payne*, No. W2008-02784-CCA-R3-PC, 2010 WL 161493, at *15. Trial counsel could have decided not to object for several valid reasons, including not wanting to emphasize the unfavorable statements. *Id.* (citing *Gregory Paul Lance*, No. M2005-01675-CCA-R3-PC, 2006 WL 2380619, at *6). Accordingly, trial counsel must be given the opportunity to explain why they did not object to the allegedly prejudicial remarks. "Without testimony from trial counsel or some evidence indicating that [their] decision was not a tactical one, we cannot determine that trial counsel provided anything other than effective assistance of counsel." *Leroy Sexton,* No. M2004-03076-CCA-R3-CD, 2007 WL 92352, at *5. Moreover, as the post-conviction court found, the jury was properly instructed on its duty under the law. *See, e.g., State v. Sexton*, 368 S.W.3d 371, 424 (Tenn. 2012) (despite prosecutor's misstatement regarding burden of proof, error was mitigated by proper jury instruction). Accordingly, despite waiver of this issue, this court concludes that the Petitioner has failed to demonstrate how trial counsel were otherwise ineffective in this regard. He is not entitled to relief on this claim.

3. Juror Misconduct

According to the Petitioner, because the jury foreperson of the original trial in this case did not reveal during voir dire that he had been arrested for public intoxication in 1989, said charge having been subsequently dismissed, the Petitioner should be granted a new trial. Following the post-conviction evidentiary hearing, the Petitioner moved to

supplement the record with several items, including the foreperson's arrest record. The State filed a response to the motion and objected to supplementation of the record with the arrest record because it was not introduced during the hearing and none of the witnesses were questioned about it. Although the Petitioner raised the issue in his supplemental amended petition for post-conviction relief, he did not question any of the witnesses about the foreperson's arrest record, and he did not otherwise seek to introduce it into evidence during the hearing. The record reflects that the motion to supplement was filed following the close of proof.

On appeal, the State argues that the evidence of the foreperson's arrest record has not been included in the record properly and, thus, was not considered by the post-conviction court during its review of this issue. Although the post-conviction court held a hearing on the motion to supplement the record, it did not issue an oral ruling at the conclusion of that hearing, and the record does not contain a copy of a written order disposing of the motion. As the State observes, though, the post-conviction court stated in its final order denying post-conviction relief that the "Petitioner offered no evidence in support of" this issue. Therefore, it would appear that the post-conviction court did not grant the motion to supplement the record with the foreperson's arrest record and, thus, did not review the arrest record. The Petitioner did not respond in his reply brief to the State's argument regarding the incomplete record. Having considered the current composition of the record, we conclude that we are prevented from considering the foreperson's arrest record as evidence. *See, e.g., Donald Keith Solomon v. State,* No. M2012-02320-CCA-R3-PC, 2013 WL 5969605, at *6 (Tenn. Crim. App. at Nashville, Nov. 7, 2013) ("However, the State points out, and we agree, that these records were not introduced as evidence or otherwise received by the post-conviction court and, thus, may not be considered by this court on appeal. *See* Tenn. R. App. P. 24(g)."). Regardless, the Petitioner has otherwise waived consideration of this issue because he could have, but did not, raise it earlier. *See* Tenn. Code Ann. § 40-30-106(g). The foreperson's 1989 arrest record would have been available to the Petitioner before his 1992 trial. Accordingly, he is not entitled to relief on this issue.

## C. Post-Conviction Proceeding

### 1. Subpoena Process

The Petitioner argues that the State improperly collected three boxes of work product from Inquisitor, Inc., via a subpoena *duces tecum* approximately two weeks before the evidentiary hearing. Although the Petitioner acknowledges that the subpoena issued by the prosecutor was facially valid, he argues that the documents requested were not returned to the post-conviction court but instead were collected and viewed by the State without his knowledge or consent. The Petitioner, thus, argues that his due process rights were violated.

After the record was filed on appeal and at the same time the Petitioner filed his appellate brief, he moved this court to supplement the record with the return receipt of the subpoena at issue herein as well as the affidavits of Nancy Oswald, then acting director of Inquisitor, Inc., and Jessica Thompson, an employee of the Office of the Post-Conviction Defender. The two affidavits suggested that the prosecutor personally retrieved the subpoenaed files from the office of Inquisitor, Inc. In support of his motion, the Petitioner stated the following:

> In his brief, Appellant alleges that his right to due process has been violated by the actions of the State and the trial court. As proof of this violation, Appellant alleges that the State improperly obtained and reviewed, extrajudicially, the complete files of Appellant's trial investigator, Inquisitor. Some of the circumstances regarding the State's acquisition of attorney-client privileged materials unfolded during the post-hearing . . . and are in the record in the form of the transcripts. However, because the State never revealed the abuse of process by which the prosecution obtained Appellant's Inquisitor files, Appellant was unaware of the circumstances referenced herein and in the attached documents until appellate briefing had commenced.

> While preparing Appellant's brief, undersigned counsel contacted Inquisitor regarding the location of their original file in Mr. Odom's case. Undersigned counsel learned from Inquisitor that the Assistant District Attorney General handling the post-conviction case had subpoenaed Mr. Odom's Inquisitor files to the courthouse for the commencement of the evidentiary hearing. The version of the subpoena return receipt in the Shelby County Criminal Court Clerk's file, attached, reflects this. The recent contact with Inquisitor revealed that the circumstances of the State's acquisition of the file are contrary to the version of events documented in the clerk's file. Counsel learned from Inquisitor that—instead of following the procedure dictated by the subpoena and Rule 17 of the Tennessee Rules of Criminal Procedure—the prosecutor personally retrieved the files from Inquisitor on the same day the subpoena was served, nearly two weeks before the hearing date listed on the subpoena. Thus, it is necessary to modify and correct the record so that it "conform[s] to the truth." *See* Tennessee Rules of Appellate Procedure, Rule 24(e).

> Undersigned counsel was given no notice of the subpoena by the State, Inquisitor, or the clerk. As this information was discovered after the closing of proof and the filing of the record in this matter, this evidence is not yet properly included in the record before this Court.

This court granted the request to supplement the record with a copy of the return receipt of the subpoena. However, we denied the motion with regard to the two affidavits, stating, "The Appellant did not submit the affidavits of Jessica Thomson and Nancy Oswald and the attached business records to the post-conviction court for consideration. This court is appellate only and may not consider matters not presented to the post-conviction court." The Petitioner has not petitioned this court to reconsider its ruling, and we see no reason to do so at this time.

As the State argues in its brief, the Petitioner has failed to cite adequately to the record on appeal in support of his argument. *See* Tenn. Ct. Crim. App. R. 10(b). Moreover, he did not present this issue to the post-conviction court for review; thus, it must be considered waived. *Cauthern v. State*, 145 S.W.3d 571, 599 (Tenn. Crim. App. 2004). Regardless, other than argument, there is nothing in the record supporting the Petitioner's contention that the State violated his rights. As noted already, we denied his request to supplement the record with the affidavits of Ms. Thomson and Ms. Oswald.

In his reply brief, the Petitioner asks that this court review the issue for plain error. The plain error doctrine allows an appellate court to review an issue that has been waived if the issue constitutes a "plain error" that affects the substantial rights of a party and consideration of the issue is necessary to do substantial justice. *See* Tenn. R. App. P. 36(b). We consider five factors when deciding whether an error constitutes plain error: (a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is "necessary to do substantial justice." *State v. Smith,* 24 S.W.3d 274, 282 (Tenn. 2000) (citing *State v. Adkisson,* 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). As the State observes, however, the plain error rule may not be applied in post-conviction proceedings to grounds that would otherwise be deemed waived. *See Grindstaff v. State*, 297 S.W.3d 208, 219 (Tenn. 2009). The Petitioner argues that "the State should not be permitted to subvert subpoena process with impunity, secretly obtaining documents *to which it may well be entitled*, in an attempt to try [him] by ambush." (Emphasis added.) Unavailability of plain error review notwithstanding, the Petitioner simply has failed to demonstrate how any substantial right was adversely affected as a result of the issuance of the subpoena or the retrieval of the contested documents. He is not entitled to relief on this issue.

## 2. Attorney-Client and Work Product Privileges

Next, the Petitioner contends that his prior trial attorneys violated his rights by improperly providing their files to the State for use in preparation of the evidentiary hearing. He relies upon the attorney-client privilege, the work product doctrine, and the attorneys' professional duty of confidentiality in support of his argument that the files are protected from disclosure without his consent. The Petitioner also argues that the

prosecution violated their ethical duties as officers of the court by failing to inform him that they were seeking to obtain his attorneys' files. The Petitioner insists that the conduct of his trial attorneys and the prosecutors in this respect "raises serious concern regarding: fundamental fairness, the appearance of impropriety, the breakdown of adversarial process, defense counsel functioning as the prosecutor, defense counsel's abandonment of their former client, and defense counsel's self-interest." The State argues that the Petitioner has waived the attorney-client privilege and work product doctrine by challenging his attorneys' representation on post-conviction. The State further argues that any violation by counsel of their ethical duties does not render the evidence inadmissible at the post-conviction hearing. During the evidentiary hearing, the post-conviction court overruled the Petitioner's objections related to questioning about, and the introduction of, these files.

We agree with the State. "If the client attacks the competency of his attorney, the [attorney-client] privilege is viewed as waived regarding the representation in issue." *Bryan v. State*, 848 S.W.2d 72, 80 (Tenn. Crim. App. 1992). As this court explained in *Bryan*:

> To the limited extent of the issue raised by the petitioner regarding his [attorney's representation], an implied waiver of privilege would be appropriate upon the state's showing that the information possessed by the trial attorney was vital to its defense in the post-conviction action. A post-conviction case is not a criminal prosecution, but is a means to address a petitioner's allegations of constitutional wrongdoing in a previous convicting or sentencing process. However, once a petitioner alleges and seeks to prove constitutional error, the state should be entitled to prove the absence of such error. Fairness in the judicial process demands no less.

*Id.* at 81.

Although the Petitioner mentions the "entire files" of all of his prior trial attorneys, the only item he specifically identifies in his brief is 1992 trial counsel's initial "intake interview" with the Petitioner wherein the Petitioner allegedly divulged additional crimes he committed, said he had been to the garage where the murder occurred, recalled seeing the victim drive into the garage, and said he possessed a knife at the time. The Petitioner has attacked aspects of counsel's representation during the original trial, including their failure to investigate the facts of the case adequately. In order to defend that claim, the State was allowed to question counsel about their strategy, which was based, in part, upon the Petitioner's own statements. Accordingly, the Petitioner has waived his attorney-client privilege in this respect. *See David Lynn Jordan v. State*, No. W2015-00698-CCA-R3-PD, 2016 WL 6078573, at *83 (Tenn. Crim. App. at Jackson, Oct. 14, 2016), *perm. app. denied*, (Tenn. July 19, 2017); *Christopher Kinsler v. State*, No. E2015-00862-CCA-R3-PC, 2016 WL 1072854, at *7 n.1 (Tenn. Crim. App. at

Knoxville, Mar. 17, 2016); *George T. Haynie, Jr. v. State*, No. M2009-01167-CCA-R3-PC, 2010 WL 3609162, at \*8 (Tenn. Crim. App. at Nashville, Sep. 16, 2010).

We conclude that the same rationale applies equally to the Petitioner's argument under the work product doctrine. "An attorney's work product consists of those internal reports, documents, memoranda, and other materials that the attorney has prepared or collected in anticipation of trial." *Wilson v. State*, 367 S.W.3d 229, 235 (Tenn. 2012) (citing *State v. Hunter*, 764 S.W.2d 769, 770 (Tenn. Crim. App. 1988)). "'The central purpose of the work product doctrine is to protect an attorney's preparation for trial under the adversary system.'" *Id. (*quoting *Swift v. Campbell,* 159 S.W.3d 565, 572 (Tenn. Ct. App. 2004)). "The doctrine is based on an attorney's right to conduct his or her client's case with a certain degree of privacy, preventing the discovery of materials prepared by opposing counsel in anticipation of litigation and protecting from disclosure an adversary's 'mental impressions, conclusions, and legal theories of the case.'" *Id.* (quoting *Memphis Publ'g Co. v. City of Memphis,* 871 S.W.2d 681, 689 (Tenn. 1994)).

Aside from the previously mentioned "intake interview," the Petitioner does not identify any item he thinks should be protected under the doctrine. Again, however, because he challenges the representation of his trial attorneys, he has waived protection of the work product doctrine. As the record clearly reflects, the Petitioner asked his former attorneys questions surrounding the content of their files. Thus, the State was permitted to use those files to defend counsels' representation. *See Boyd v. Comdata Network, Inc.*, 88 S.W.3d 203, 226 (Tenn. Ct. App. 2002) ("Litigants may not use the work product doctrine as a sword and a shield."). The Petitioner is not entitled to relief on this claim.

The Petitioner also claims within this issue that trial counsel had a continuing ethical duty not to disclose any confidential information. In support of his claim, the Petitioner cites to a Formal Ethics Opinion of the Board of Professional Responsibility of the Tennessee Supreme Court. *See* TN Eth. Op. 2013-F-156 (Tenn. Bd. Prof. Resp.), 2013 WL 9636579 (June 14, 2013). Therein, the Board was posed with the following question: "May a criminal defense lawyer alleged by a former criminal client to have rendered ineffective assistance of counsel voluntarily provide information to the prosecutor defending the claim outside the court supervised setting?" The Board concluded,

> [T]he Tennessee Rules of Professional Conduct do not strictly prohibit a former defense lawyer alleged to have rendered ineffective assistance of counsel from providing information to the prosecution prior to or outside an in-court proceeding. Exceptions to the confidentiality rules *permit, but do not require*, the former defense lawyer to make limited voluntary disclosures of information to the prosecution outside the in-court supervised proceeding.

*Id.* at *5 (emphasis in original). In reaching its conclusion, the Board explained:

A former client seeking relief from a criminal conviction on the basis of ineffective assistance of counsel must establish that the former defense lawyer's performance fell below an objective standard of reasonableness and that the performance, or lack thereof, prejudiced the former client. *Strickland v. Washington*, 466 U.S. 668, 686 (1984). The prosecution is placed in the position of having to defend against the allegations of ineffective assistance by the former defense lawyer to preserve the conviction. Both the prosecution and the former defense lawyer, therefore, have an interest in defending against the claim. The question arises when the prosecution seeks or requests the former defense lawyer to provide information, their file(s) or an informal interview prior to or outside the in-court judicial proceeding. While ABA Formal Op. 10-456 stated ". . . it is highly unusual" for a trial lawyer accused of providing ineffective representation to assist the prosecution in advance of testifying in a judicial proceeding, anecdotally, it does not appear unusual in Tennessee.

*Id.* at *1. The Board continued:

RPC 1.6(b)(5) provides a permissive "self-defense" exception to confidentiality. The rule, in applicable part, provides, "[a] lawyer may reveal information relating to the representation of a client *to the extent the lawyer reasonably believes necessary . . .* to respond to allegations in any proceeding concerning the lawyer's representation of the client." (emphasis added). The exception is, by its terms, limited and permits, but does not require, the former defense lawyer to disclose information relating to the former representation, but only to the "extent the lawyer reasonably believes necessary." "Reasonably believes" is an objective standard which "denotes that the lawyer believes the matter in question and that the circumstances are such that a lawyer of reasonable prudence and competence would ascertain the matter in question." RPC 1.0(j)[.] The exception gives the lawyer discretion to determine not only whether to make a disclosure but, if so, what disclosure will be made. "A lawyer's decision not to disclose as permitted by paragraph (b) does not violate this Rule." RPC 1.6, cmt. [14]. If a disclosure is made, the exception requires the lawyer to narrow or limit his disclosure only to information that the lawyer reasonably believes necessary to respond to the specific allegations of the petition, no greater than is necessary to accomplish of the exception's purpose. See RPC 1.6, cmts. [[13][14]. The exception does not require that the disclosures be made in an in-court supervised proceeding or setting nor with the supervision or approval of the court.

- 71 -

*Id.* at *3.

The Petitioner complains that counsel gave their *entire* files without narrowing their disclosure. Although the Board stated in its opinion that "[i]ndiscriminate, unlimited nor *carte blanche* disclosure of information relating to the former representation possessed by or in the file(s) of the former defense lawyer is not permitted," *Id.* at *1, the Petitioner fails to point to any specific item, other than the "intake interview," which should have been withheld and why. The attorneys were not questioned about their decisions to disclose their files to the State. We must presume, therefore, that they reasonably believed their actions were necessary to assist the State in its defense of their representation. Regardless, the Petitioner does not explain how any alleged violation of the Rules of Professional Conduct by his former attorneys entitles him to post-conviction relief. The opinion of the Board relied upon by the Petitioner does not authorize the relief requested. Indeed, he cites no controlling authority supporting his request for a new post-conviction proceeding based upon the actions of counsel. Tenn. Ct. Crim. App. R. 10(b). The same holds true for his claim that the prosecution violated their ethical duties by failing to inform post-conviction counsel that they were seeking the files. He is not entitled to relief on this claim.

3. Politicization of Case

The Petitioner argues that his "case has been repeatedly used as a political tool to challenge the death penalty, and the repeated politicization of this case has been to the detriment of [the Petitioner], the judiciary, due process principles, and the right to be free from cruel and unusual punishment." The Petitioner focuses on the judicial retention elections occurring after our supreme court released its opinion in the initial direct appeal affirming the finding of guilt but reversing the Petitioner's sentence of death and remanding for a new sentencing hearing. Justice Penny White did not author the opinion but joined in the majority. *Odom*, 928 S.W.2d at 33. Justice White was not retained on the bench following the retention elections in August 1996. The Petitioner suggests that her vote to overturn his death sentence led to her removal. The Petitioner also refers to retention elections in general and suggests that the behavior and rulings of the judges in this State change near election time. The Petitioner supports his argument with numerous news and law review articles and refers to comments offered by two United States Supreme Court Justices in dissenting opinions suggesting that Alabama judges succumb to political pressure during retention election years. According to the Petitioner's argument, his "case has resulted in ongoing due process violations at *every* stage of judicial review and appeal. The bell cannot be unrung, but [the Petitioner] should be granted the relief to which he was entitled at his first resentencing."

The post-conviction court held that this issue was without merit. The court found that "[t]here was little or no publicity surrounding the litigation of his post-conviction claims." We agree. To the extent the Petitioner is challenging any politicization

surrounding the earlier proceedings in this case, he has waived consideration of the issue. *See* Tenn. Code Ann. § 40-30-106(g). Moreover, the Petitioner cites no controlling legal authority authorizing the relief requested. *See* Tenn. Ct. Crim. App. R. 10(b). We agree with the State's well-observed comments on this issue:

> [T]he [P]etitioner has not demonstrated that he has, at any stage, been denied a fair hearing or review. Nor has the [P]etitioner pointed to any specific decision of this Court or our Supreme Court that was contrary to law. In fact, after the removal of Justice White, our Supreme Court reversed the [P]etitioner's second death sentence in [*State v. Odom*, 137 S.W.3d 572 (Tenn. 2004)]. It is therefore unclear how the alleged politicization has prejudiced him.

The Petitioner's argument on this novel issue relies solely on assumptions. The Petitioner has not shown any actual deviation from the course of judicial conduct mandated by the Post-Conviction Procedure Act or the Rules of Post-Conviction Procedure. Tenn. Code Ann. §§ 40-30-101 et seq.; Tenn. Sup. Ct. Rule 28. Indeed, the Petitioner never requested recusal of the judge presiding over his post-conviction proceeding. The Petitioner is not entitled to relief on this issue.

4. Destruction and/or Loss of Evidence

Next, the Petitioner argues that he "has been prejudiced by the passage of time that has elapsed between the events that underlie his conviction – a 1991 homicide for which he was convicted in 1992 – and his first opportunity to present guilt/innocence phase related claims in state post-conviction proceedings in 2014." According to his argument, the Petitioner was unable to test two pieces of evidence in post-conviction, a knife found on his person at the time of his arrest and his signed confession, because the State lost or destroyed them. The Petitioner also refers to several other pieces of evidence that he was unable to examine in post-conviction: photographs of lineup; other crime scene photographs; the seatbelt buckle containing the fingerprint matched to the Petitioner; samples and documentary evidence of blood observed at other portions of the crime scene; and samples and documentary evidence of blood recovered from above the victim's car. The Petitioner asserts generally that "[t]he State violated due process by destroying material evidence that may have exculpated [him]." The Petitioner's argument on this issue is not altogether clear, but he appears to argue that he was not afforded a full and fair evidentiary hearing because he was unable to test the evidence.

Both the United States and Tennessee Supreme Courts have held that the full scope of due process protections does not extend to post-conviction proceedings. *Pennsylvania v. Finley*, 481 U.S. 551, 554-55 (1987); *Stokes v. State*, 146 S.W.3d 56, 60 (Tenn. 2004). "'[T]he opportunity to collaterally attack constitutional violations occurring during the conviction process is not a fundamental right entitled to heightened

due process protection.'" *Stokes*, 146 S.W.3d at 60 (quoting *Burford v. State*, 845 S.W.2d 204, 207 (Tenn. 1992)). "All that due process requires in the post-conviction setting is that the defendant have 'the *opportunity* to be heard at a meaningful time and in a meaningful manner.'" *Id.* at 61 (quoting *House v. State*, 911 S.W.2d 705, 711 (Tenn. 1995)). The record reflects that the Petitioner requested to view all of the evidence in custody or control of the State. The trial court granted his request and directed the State to make available to the Petitioner the prosecution's entire file (minus attorney work product) and any items requested by the Petitioner which were contained in the Memphis Police Department's file. The post-conviction court noted that prior to the filing of the post-conviction petition in this case, the entire supreme court record, including the original exhibits from the 1992 trial, was destroyed by the historic flood that occurred in Nashville in 2010. The court also noted that prior to the 2007 resentencing hearing, the Shelby County Clerk's Office either lost or destroyed the knife purportedly used in the murder. The post-conviction court further observed, however, that most of the items contained in the destroyed supreme court record were duplicates of originals maintained by the parties, the trial court clerk, or the police department. The record reflects that the State provided the Petitioner with everything it possessed.

The post-conviction court concluded that the Petitioner was not denied due process or a fair hearing and, thus, was not entitled to post-conviction relief. The Petitioner was given the opportunity to test some of the items he requested, including two glass vacuum containers, one labeled "rectal swabs" and one labeled "vaginal swabs," and a sealed envelope labeled "hair and fiber from right hand," as well as all of the fingerprint evidence maintained by the police department. The Petitioner did not seek to test any of that evidence, however. Although the Petitioner focuses his due process argument on the missing knife and his original statement, as discussed below, the fact that those items are not available for testing does not warrant the granting of post-conviction relief. The same holds true for the other missing items referenced by the Petitioner. Based upon our review of the extensive post-conviction proceedings that occurred in this case, it is evident that the Petitioner had a fair and reasonable opportunity to be heard on his alleged grounds for relief.

In further support of his due process claim, he cites *State v. Merriman*, 410 S.W.3d 779 (Tenn. 2013), and *State v. Ferguson*, 2 S.W.3d 912 (Tenn. 1999). Those cases stand for the proposition that the loss or destruction of potentially exculpatory evidence may violate a defendant's right to a fair trial. "[T]he State's duty to preserve evidence is limited to constitutionally material evidence described as 'evidence that might be expected to play a significant role in the suspect's defense.'" *Merriman*, 410 S.W.3d at 785 (quoting *Ferguson*, 2 S.W.3d at 917)). If the State fails in its duty, a trial court must examine (1) the degree of negligence involved, (2) the significance of the destroyed evidence, considered in light of the probative value and reliability of secondary or substitute evidence that remains available, and (3) the sufficiency of the other evidence used at trial to support the conviction in order to determine whether a trial conducted

without the missing or destroyed evidence would be fundamentally fair. *Id*.

As both the post-conviction court and the State observe, however, it is unclear whether *Ferguson*, which discusses remedies for the State's failure to preserve evidence prior to trial, even applies in the post-conviction context. *See Tommy Nunley v. State*, No. W2014-01776-CCA-R3-PC, 2015 WL 1650233, at *3 (Tenn. Crim. App. at Jackson, Apr. 13, 2015), *perm. app. denied*, (Tenn. Sep. 21, 2015); *Tommy Nunley v. State*, No. W2003-02940-CCA-R3-PC, 2006 WL 44380, at *6 n.3 (Tenn. Crim. App. at Jackson, Jan. 6, 2006); *Edward Thompson v. State*, No. E2003-01089-CCA-R3-PC, 2004 WL 911279, at *2 (Tenn. Crim. App. at Knoxville, Apr. 29, 2004). Addressing a similar claim regarding lost or destroyed evidence as the one advanced by the Petitioner herein, this court has previously recognized that

> the items in questions [sic] were available at the trial. Their destruction or loss did not occur until after the petitioner's conviction. We agree with the State that we cannot presume that these items, which the defense did not utilize at the trial, were exculpatory. The holding in *Ferguson* is not helpful to the petitioner's argument in this regard, which we conclude is without merit.

*Gerald Lee Powers v. State*, No. W2009-01068-CCA-R3-PD, 2012 WL 601173, at *40 (Tenn. Crim. App. at Jackson, Feb. 22, 2012). For comparison, the Post-Conviction DNA Analysis Act of 2001 provides that a trial court shall or may order DNA testing of evidence in certain cases, including those in which a defendant has been convicted of first degree murder, if the evidence is still in existence. Tenn. Code Ann. §§ 40-30-304, -305. If the evidence is determined to be missing, however, a trial court may properly dismiss the post-conviction petition requesting the testing. *See Danny Miller v. State*, No. E2011-00498-CCA-R3-PC, 2012 WL 1956526, at *3 (Tenn. Crim. App. at Knoxville, May 31, 2012). *See also Powers v. State*, 343 S.W3d 36, 48 (Tenn. 2011) (stating that the evidence must still be in existence before testing will be ordered).

Notwithstanding whether such a challenge is available on post-conviction, the post-conviction court undertook a *Ferguson* analysis and determined that the Petitioner's due process rights were not violated:

> Initially, this court must determine whether the state had a duty to maintain the knife purportedly used to kill the victim. The knife was introduced during the guilt phase of petitioner's first and second trial. However, it appears the knife, which was placed in the care of the Shelby County Criminal Court Clerk's Office, was lost prior to petitioner's 2007 re-sentencing proceeding. The parties agree that the knife was in the custody of the Clerk's Office when it went missing. Therefore, it is not clear that the knife was lost by the State. In a similar case to the one before

this court, the Tennessee Court of Criminal Appeals held there was no due process violation where the clerk's office was responsible for the loss or destruction of evidence. *See* [*James Thomas*] *Jefferson v. State of Tennessee*, No. M2003-01422-CCA-R3-PC, [2005 WL 366891, at \*10-11 (Tenn. Crim. App. Feb. 16, 2005)]. In *Jefferson* the evidence at issue was destroyed prior to trial. Petitioner argued trial counsel were ineffective in failing to request the court instruct the jury, pursuant to *Ferguson*, that they may infer that the missing evidence was favorable to the defendant. The Court found that the evidence was destroyed by the clerk's office and further found there was nothing in the record "to indicate that the clerk conferred with the district attorney general's office before purging these exhibits or any other exhibits that were either discarded or destroyed." *Id*. at \*11. The Court found, "to the contrary, when the district attorney general went in search of the exhibits, he was puzzled as to why he could not find them." *Id*. The Court determined that "because the State did not have the lost items in its possession or cause the loss of the items, in good or bad faith, there is no due process violation." *Id*. Here, it appears the State did not have the items in its possession when they were lost and it further appears the State did not confer with the clerk's office regarding the handling of such items. Nevertheless, this court finds, even if the state could be held responsible for the loss of the knife, petitioner is not entitled to relief.

*Ferguson* maintains that the State's duty to preserve evidence extends only to evidence which would play a significant role in a defendant's defense. To establish such materiality a defendant must demonstrate that the evidence possessed an exculpatory value that was apparent before the evidence was destroyed and demonstrate the evidence is of such a nature that the defendant would be unable to obtain comparable evidence by other available means. *Ferguson*, 2 S.W.3d at 917. In the instant case, petitioner asserts that the evidence is crucial to presenting his post conviction claims. Petitioner bears the burden of proving all factual allegations contained in his post conviction petition by clear and convincing evidence. *See* Tenn. Code Ann. § 40-30-110(1) (2003). "Clear and convincing evidence means any evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *State v. Holder*, 15 S.W.3d 905, 911 (Tenn. Crim. App. 1999) (quoting *Hodges v. S.C. Tool & Co.*, 833 S.W.2d 896, 901 n.2 (Tenn. 1992)). Petitioner contends that the knife is needed to establish that counsel were ineffective in failing to challenge the medical examiner's testimony regarding the ability of the knife in question to cause certain wounds found on the victim. The medical examiner testified that, even though the knife at issue appeared to be three inches in length, it was

capable of causing stab wounds measuring up to five inches in length depending on the placement of the injuries on the victim's body. Specifically, he stated that a knife such as the one at issue could have caused four inch wounds to the victim's chest due to the elastic nature of the chest cavity. Petitioner suggests that, if he had access to the knife, he could have the knife examined and present testimony contradictory to that of the medical examiner which would establish that trial counsel's failure to challenge the trial testimony of the state's medical examiner was in fact negligent and prejudicial and the trial court's comments regarding the knife improperly tainted the jury deliberations.

This court finds that the evidence is not material to the presentation of petitioner's claims. This court finds the assertion that the knife is in any way exculpatory is speculative at best. Given that the petitioner confessed to using the knife to kill the victim and gave a vivid description of the knife and the crime, including the brand name of the knife, and given that the knife was recovered on the petitioner's person at the time of his arrest, this court does not find that the knife had any apparent potentially exculpatory value at the time that it was placed in the custody of the Clerk's office or at the time that it was actually lost by the Clerk's office. Moreover, even if the court were to also find that knife had some evident potentially exculpatory value prior to its destruction, based upon the defendant's detailed description of the knife, including the brand and model and the fact that photographs of the knife still exist, this court finds that petitioner should be able to obtain comparable evidence to utilize in any type of testing or comparison that he deems necessary to the presentation of his post conviction claims. If the assertion is merely that the State's medical examiner was mistaken in indicating that the knife in question could have caused the wounds on the victim, surely an expert could examine a knife of the same make as the one presented at trial and provide whatever analysis or testimony as is required to support petitioner's claims. It further appears that such comparisons may even be able to be made utilizing the photographs of the murder weapon which appear to still exist.

Therefore, this court finds a due process claim cannot be supported under the Ferguson test.

Moreover, even if this court were to find the State's action led to the loss of the knife and were to find that the knife is in fact material to the presentation of petitioner's post conviction claims and thus should have been maintained by the State, this court finds the remedy sought by the petitioner is not warranted. In determining the appropriate remedy for such a due process violation, the court must consider the degree of negligence

involved, the significance of the lost evidence in light of the probative value and reliability of other evidence that remains available to the petitioner, and the sufficiency of the other evidence supporting petitioner's conviction. *Ferguson*, 2 S.W.3d at 917. In evaluating such factors this court finds a post conviction hearing held without the missing evidence would not be fundamentally unfair.

As stated above, this court finds the State's role in the loss of the evidence in question to be minimal. Moreover, the significance of the knife is slight when compared to the availability of the same type of knife for comparison or the availability of analysis based upon photographic evidence. Finally, the sufficiency of the remaining evidence supporting petitioner's conviction is great. The petitioner's fingerprints were found in the victim's vehicle where the murder occurred. Additionally, as mentioned above, the petitioner confessed to stabbing the victim. For these reasons, this court does not find that a post conviction proceeding conducted without the knife would offend principles of fundamental fairness.

. . . .

The assertion [that] the line up photos; crime scene photos; autopsy; fingerprint; or blood evidence is in any way exculpatory is speculative at best. Specifically, given the petitioner confessed to stabbing and raping the victim and gave a vivid description of the crime, this court does not find the autopsy, lineup photos, or various crime scene photos have any apparent exculpatory value. Moreover, post conviction counsel have further failed to demonstrate how the blood or fingerprint evidence would potentially exculpate petitioner. Therefore, this court finds a due process claim cannot be supported under the Ferguson test.

Finally, even if this court were to find the State's action led to the loss of the specified evidence and were to find the evidence is in fact material to the presentation of petitioner's post conviction claims and thus should have been maintained by the State, this court finds the remedy sought by the petitioner is not warranted. In determining the appropriate remedy for such a due process violation, the court must consider the degree of negligence involved, the significance of the lost evidence in light of the probative value and reliability of other evidence which remains available to the petitioner, and the sufficiency of the other evidence supporting petitioner's conviction. *Ferguson*, 2 S.W.3d at 917. In evaluating such factors this court finds a post conviction hearing held without the missing evidence would not be fundamentally unfair.

. . . .

Next, this court addresses petitioner's claims relating to the destruction of his statement. Petitioner acknowledges 1992 counsel were provided a copy of his written, signed statement. However, he argues the police failed to provide counsel with additional law enforcement documents pertaining to the written statement as well as other potentially exculpatory reports pertaining to alternate suspects. He argues the prosecution's file contains several different versions of his alleged confession and contends one version contains various pages which are initialed, "R.O." He suggests the initials appear to be in different handwriting than the signature, "Richard Odom." He alleges the questionable initials seem to be more similar to Officer Roleson's handwriting than his own handwriting. Petitioner argues because the police destroyed the original signed and initialed reports, he is precluded from developing such a claim. As discussed above, this court finds absolutely no basis for petitioner's claim the initials or signature is forged and offered no proof supporting this assertion. Thus, due process does not entitle petitioner to relief based upon this claim.

We agree. The Petitioner confessed to his involvement in the crime. Moreover, he was given an opportunity to test other evidence possessed by the State, including biological samples, but apparently declined to do so. Though he complains about not being able to examine the original signed statement, as the State notes, he did not offer proof that an examination of a copy of the original statement, which is available, would otherwise be insufficient. *See Pylant*, 263 S.W.3d at 869. Based upon our review, we conclude that the Petitioner was not deprived of his due process right to a meaningful opportunity to present his grounds for post-conviction relief. He is not entitled to relief on this issue.

5. Admission of Video

The Petitioner argues that the post-conviction court erred by allowing the State to play a videotape during Ms. Shettles' testimony of a 1991 Memphis news broadcast in which the Petitioner discussed his recollection of the charged offense. The video was not played during any of the previous trials in this case. The post-conviction court overruled the Petitioner's objection to the admission of the video, but the court did agree that the video was not entirely relevant. On appeal, the Petitioner states that the videotape is neither relevant nor reliable and that the State failed to properly authenticate the record. He does not explain, however, how its admission affected his ability to present his case for post-conviction relief. The post-conviction court did not rely upon the video in ruling on any of the issues that have been presented on appeal. This court has reviewed the

record in light of the Petitioner's argument and concludes that this issue is without merit.

### D.  Challenges to the Death Sentence

1.  Life without Possibility of Parole

The Petitioner contends that he has been deprived of due process of law and the right to be free from cruel and unusual punishment because he was not eligible to be sentenced to life without the possibility of parole.  The Petitioner previously raised this claim.  This court rejected it, and our supreme court affirmed the ruling.  As the supreme court stated:

> In 1993, the General Assembly amended the capital sentencing statutes to provide for the sentence of life imprisonment without the possibility of parole.  *State v. Keen,* 31 S.W.3d 196, 213 (Tenn. 2000) (citing 1993 Tenn. Pub. Acts ch. 473), *cert. denied,* 532 U.S. 907, 121 S. Ct. 1233 (2001).  Prior to 1993, the only punishments available for a person convicted of first degree murder were life imprisonment and death.  *See id.; State v. Cauthern,* 967 S.W.2d 726, 735 (Tenn.), *cert. denied,* 525 U.S. 967, 119 S. Ct. 414 (1998).  In *Keen,* our supreme court held that neither the state nor federal constitution required that a jury be allowed to consider life without parole for offenses committed prior to July 1, 1993.  31 S.W.3d at 217 n. 7.

*Odom*, 137 S.W.3d at 596-97.  Accordingly, this issue has been previously determined for post-conviction purposes.  Tenn. Code Ann. § 40-30-106(h).  The Petitioner is not entitled to relief.

2.  Delay in Execution

The Petitioner argues that the Eight Amendment's prohibition against cruel and unusual punishment prevents the State from carrying out his death sentence because of the length of time between his conviction for first degree murder and the imposition of the death sentence following the second resentencing hearing.  Citing *State v. Austin*, 87 S.W.3d 447 (Tenn. 2002), the post-conviction court denied relief on this ground.  We agree.

In *Austin*, our supreme court considered whether a "twenty plus years delay in imposing the death penalty has eviscerated any justification for carrying out the sentence of death."  87 S.W.3d at 485.  The court held:

> [W]e perceive no constitutional violation under either the federal or the Tennessee constitution.  We remain unconvinced that neither this state's

capital sentencing law nor the accompanying subsequent appellate review of a capital conviction was enacted with a purpose to prolong incarceration in order to torture inmates prior to their execution. As in most cases, the delay in the instant case was caused in large part by numerous appeals and collateral attacks lodged by the Appellant. This issue is without merit.

*Id.* at 486. Accordingly, given our supreme court's opinion on this issue, the Petitioner is not entitled relief.

3. Constitutionality of Tennessee's Death Penalty Statute

The Petitioner advances numerous challenges to the imposition of the death penalty. To the extent that any of these claims have not been previously determined or waived for post-conviction purposes, *see* Tennessee Code Annotated Section 40-30-106(g) and (h), they are otherwise without merit. The Petitioner asserts the following: (1) his right to equal protection was violated by a lack of statewide standards for pursuing the death penalty; (2) the death penalty impinges upon his fundamental right to life and the prohibition against cruel and unusual punishment; (3) the death sentence was imposed in an arbitrary and capricious manner because (a) no uniform standards or procedures for jury selection existed to ensure open inquiry concerning potentially prejudicial subject matter, (b) the death qualification process skewed the makeup of the jury and resulted in a guilt-prone jury, (c) he was prohibited from addressing each juror's popular misconceptions about matters relevant to sentencing, (d) he was prohibited from presenting a final closing argument in the penalty phase, (e) the jury was required to agree unanimously to a life verdict, (f) the jurors likely believed they were required to unanimously agree to the existence of mitigating circumstances because of the failure to instruct the jury on the meaning and function of mitigating circumstances and the effect of a non-unanimous verdict, and (g) the jury was not required to make the ultimate determination that death was the appropriate penalty; (4) the death penalty was inappropriate because the aggravating circumstances were not included in the indictment; (5) the proportionality review process was not conducted in a manner sufficient to satisfy due process or the "law of the land"; (6) the appellate review process was not meaningful because (a) the courts could not reweigh proof due to the absence of written findings concerning mitigating circumstances, (b) the information relied upon for comparative review was inadequate and incomplete, and (c) the methodology, in which only cases where a death sentence was upheld are reviewed, is fundamentally flawed; and (7) Tennessee's current protocol for carrying out executions is illegal under state and federal laws. Each of these exact claims have been rejected previously by the courts of this state. *See, e.g., Robert Faulkner v. State*, No. W2012-00612-CCA-R3-PD, 2014 WL 4267460, at *102-103 (Tenn. Crim. App. at Jackson, Aug. 29, 2014). The Petitioner's contention that the death penalty fails to promote any compelling state interest has also been rejected. *See State v. Holton*, 126 S.W.3d 845, 872 (Tenn. 2004).

4.  Proportionality Review

The Petitioner argues that the sentence of death in this case is disproportionate given his cognitive impairments, mental illness, intoxication at the time of the offenses, and inability to premeditate the offenses.  Our supreme court previously held on direct appeal that the Petitioner's death sentence was not excessive or disproportionate to the penalty imposed in similar cases.  *Odom*, 336 S.W.3d at 572-73.  Accordingly, the Petitioner is not entitled to relief on this claim.

## III.  Conclusion

For the foregoing reasons, we conclude that the post-conviction court did not err by denying post-conviction relief to the Petitioner.  The Petitioner has failed to establish the existence of any error warranting relief.  Thus, his cumulative error argument is also without merit.  Accordingly, the judgment of the post-conviction court is affirmed.

_____
NORMA McGEE OGLE, JUDGE